UNITED HOTELS OF P.R., INC., demandante y recurrida, *v.* MARVIN WILLIG, demandado y recurrente.

*Número:* R-62-275　　　*Resuelto:* 9 de octubre de 1963

*Gutiérrez & Ramírez, Carlos G. Látimer* y *Luis Fernández Ramírez,* abogados del recurrente; *Montilla & Benítez,* abogados de la recurrida.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Rigau.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

El demandado es abogado y ejerce su profesión en Washington, D.C. Con motivo de negocios en Puerto Rico permaneció por largas temporadas en la isla a fines del año 1956 y durante la primera parte del 1957. Durante sus estadas en Puerto Rico el demandado visitó con frecuencia la sala de juego del Hotel Condado, propiedad de la demandante. En sus visitas al casino de dicho hotel el demandado compró fichas y jugó. En algunas ocasiones, concluyó el tribunal de instancia, el demandado ganó, cambió las fichas que había obtenido en dinero en efectivo y se retiró por el resto de la noche llevándose consigo la ganancia. En otras ocasiones perdió, obtuvo entonces crédito de la sala de juego, firmando distintas obligaciones en las cuales se comprometía a pagar al casino la cantidad que adeudaba.[1] El total de la deuda del demandado ascendió a la suma de $39,365.00, cuya cantidad luego se redujo a $37,990.00. Durante el tiempo antes mencionado, el demandado también frecuentó las salas de juego del Hotel Caribe Hilton, del Club Flamboyán, y de otros hoteles. Concluye también el tribunal a quo que el demandado jugaba también en distintos casinos en los Estados Unidos, incluyendo los de Las Vegas, en Nevada.

Al no recibir el pago de la deuda la demandante demandó en cobro de dinero. En su contestación el demandado aceptó "que durante el período de tiempo allí indicado . . . expidió

---

[1] Las salas de juego están autorizadas a extender crédito a los jugadores por el Reglamento del Secretario de Hacienda, 15 R.&R.P.R. sec. 76a–7(h).

cheques por la cantidad alegada en la demanda como pago de deudas de juego incurridas en un casino que opera la demandante." Como defensas especiales alegó, en síntesis, que dichos cheques fueron hechos sin causa válida; que la demandante no puede cobrar la deuda por no permitirlo la ley; y, en la alternativa, que el tribunal debía reducir el monto de la deuda. Visto el caso, el Tribunal Superior condenó al demandado a pagar a la demandante la suma de $37,990.00, más las costas y $1,000.00 por concepto de honorarios de abogado.

■ Ante nos el demandado recurrente señala cinco errores. Por estar muy relacionados entre sí discute él conjuntamente los tres primeros errores y así lo haremos nosotros. En estos tres primeros errores lo que argumenta el recurrente es que erró el tribunal al conceder el remedio solicitado por la demandante porque la ley no concede acción para reclamar lo que se gana en un juego de suerte, y cita al efecto el Art. 1698 del Código Civil, 31 L.P.R.A. sec. 4771, que a su juicio, así lo dispone con meridiana claridad. Ya que el demandado jugó juegos permitidos por la ley en Puerto Rico (como luego veremos) probablemente bastaría con señalar que el mismo Código, tres artículos más adelante (en su Art. 1701), también dispone con igual claridad que "El que pierde en un juego o apuesta *de los no prohibidos* queda obligado civilmente." (Subrayado nuestro.) Pero no nos bastará con sólo mencionar lo antes citado porque entendemos que el derecho no es solo *fiat* sinó también razonamiento. [2]

---

[2] Decimos *el derecho* (en francés *droit*, en italiano *diritto*, en alemán *Recht*, en latín *ius*) teniendo en mente la diferencia de ese término con *la ley* (en francés *loi*, en italiano *legge*, en alemán *Gesetz*, en latín *lex*) porque a la ley, producto de un organismo con poderes legislativos (Asamblea Legislativa, Congreso, Parlamento, etc.) sí le puede bastar con ser *fiat*, aunque, desde luego, dentro del marco constitucional en que dicho organismo opere. (*"Potestas in populo, auctoritas in senatu"* expresó Cicerón, *De Legibus*, III, 12.) El Derecho, sin embargo, tiene no sólo un contenido de legalidad sino también un contenido ético. Recuérdese el rol fundamental que en la historia del derecho han tenido la epiqueya griega

Sobre este asunto de juegos de azar la regla general que informa nuestra legislación es que los juegos de suerte o azar están prohibidos, pero, naturalmente, están prohibidos por ley; lo cual quiere decir que también por ley, puede haber, y hay, excepciones a dicha regla. El Código Penal en su Art. 299 prohibe "cualquier juego de azar, con barajas, dados, o de cualquier otra clase," 33 L.P.R.A. sec. 1241, y el Código Civil en su Art. 1699, dispone que "se consideran prohibidas las apuestas que tienen analogía con los juegos prohibidos". 31 L.P.R.A. sec. 4772. También prohibe la ley las loterías o

y la equidad romana, influencia que sigue vigorosa en nuestros días. El tema es interesantísimo y pone de manifiesto los orígenes comunes de ciertas grandes tendencias en los derechos anglosajón y civil o continental europeo. Recuérdese que, después de todo, los primeros cancilleres ingleses eran eclesiásticos y a través de ellos el derecho anglosajón recibió no poca influencia del derecho canónico y romano. Así, no puede extrañarnos que la *equity* inglesa, aplicada originalmente por cancilleres de procedencia eclesiástica, tuviera su base en la *aequitas* romanocanónica, de la cual viene a ser una continuación. Para los romanos, ha escrito Stammler, el Derecho era "el arte de lo bueno y de lo justo", *Tratado de Filosofía del Derecho*, trad. española de Roces, Madrid, Editorial Reus, 1930, pág. 29. Para un excelente resumen de la historia de la equidad desde Roma hasta nuestros días puede verse, Castán, *La Formulación Judicial del Derecho*, 2da. ed., 1954, Editorial Reus, Madrid, págs. 35-95. Para un reconocimiento de la influencia romana hecho por un distinguido profesor del mundo del *common law* véase el Capítulo III de McIlwain, *Constitutionalism Ancient and Modern*, Cornell Univ. Press, 1940. Por ejemplo:

"There is probably no other social revolution in recorded history so important, so complete, so continuous over so long a period, as this evolution traceable step by step in the sources of Roman private law. We find institutions of an age long bygone still preserved in a law that is binding, but alongside it an actual administration enforcing principles often in many ways more advanced than those embodied in our own modern codes. . . . The modern sociological school of jurists might, if they cared to look for it, find the strongest support for their theories in this remarkable evolution of Roman law." McIlwain, obra citada, pág. 54.

Como comenzamos a indicar al principio de este escolio, en inglés la palabra *law* incluye ambos conceptos: el derecho y el de la ley. Claro, para la ley el idioma inglés tiene también la palabra *statute*. Pero no tiene el equivalente de *derecho, droit*, etc. De la dificultad que esta deficiencia, como la llama Pound, del vocabulario jurídico anglosajón ha creado en la literatura jurídica en inglés se ha ocupado dicho autor. Véase Pound, *Law Finding Through Experience and Reason*, (1960) pág. 3. Véase también del mismo autor *Jurisprudence*, I, 12 y II, 8.

rifas, la "bolita", el "bolipul", y otras variantes de esos juegos, 33 L.P.R.A. secs. 1211–1259.

Como excepciones a la regla general mencionada, la ley permite los bingos para fines caritativos o educativos en iglesias y logias, 15 L.P.R.A. secs. 151–157, establece una lotería oficial cuyo producto neto va parte al erario público insular y parte a los municipios, 15 L.P.R.A. secs. 111–128, y mediante la Ley Núm. 221 de 15 de mayo de 1948 se permiten los juegos de azar en salas de juego operadas mediante franquicia expedida de acuerdo con los términos de esa ley, 15 L.P.R.A. secs. 71–84.

La sala de juego en que jugó el demandado es una de las operadas en un hotel de turismo, en San Juan, bajo los términos de la citada Ley Núm. 221. Declara dicha ley en su exposición de motivos lo siguiente:

"El propósito de esta Ley es contribuir al fomento del turismo mediante la autorización de ciertos juegos de azar que se estilan en sitios de diversión de los grandes centros turísticos del mundo, y la reglamentación y la fiscalización de esos juegos por el gobierno a los fines de brindar al turista las mayores garantías posibles, y al mismo tiempo brindar al Tesoro de Puerto Rico una fuente adicional de ingresos." Leyes de Puerto Rico, 1948, p. 751.

La Ley Núm. 221 y los reglamentos dictados bajo su autoridad imponen condiciones estrictas y reglamentación e inspección rigurosa por parte del gobierno para la concesión y la operación de las salas de juego. Las franquicias son expedidas por el Secretario de Hacienda previa la aprobación de la Administración de Fomento Económico. Los concesionarios deberán poseer y administrar un hotel, restaurante o centro de diversión para turistas; no podrán haber sido convictos de delito grave o delito menos grave que envuelva depravación moral, deberán gozar de buena reputación y si son personas jurídicas, todos los accionistas o socios deberán también cumplir con estas condiciones personales. Las solicitudes de licencia serán juradas acreditando los requisitos que exige la ley y se publicará en un periódico de circulación general

en Puerto Rico una vez por semana durante cuatro semanas un aviso contentivo del hecho de la solicitud, del nombre del solicitante y del hotel o lugar donde habrá de establecerse la sala de juego.

La franquicia concedida es intransferible. El adquirente o arrendatario de una sala de juego deberá solicitar una nueva franquicia y cumplir con los réquisitos de la ley. Si el concesionario es una persona jurídica cualquier traspaso de cualquier acción o interés en la misma deberá ser notificado por escrito al Secretario de Hacienda y a la Administración de Fomento. La falta de dicha notificación o la ocultación del verdadero dueño o dueños de una sala de juegos, o de cualquier participación en la persona jurídica concesionaria de una franquicia, conllevará la cancelación de la franquicia.

Los inspectores de la Administración de Fomento tienen libre acceso a la sala de juego, a su equipo y sus libros, 15 R.&R.P.R. sec. 76–16, y las salas de juego vienen obligadas a suministrar al administrador de Fomento Económico toda la información que éste solicite en relación con las salas de juego, su operación, sus empleados y sus dueños o accionistas, 15 R.&R.P.R. sec. 76a–1(6). Las salas de juego no pueden anunciarse públicamente, ni admitir personas menores de 18 años de edad. En los distintos juegos el reglamento establece el límite máximo de las apuestas; el Reglamento de la Administración de Fomento Económico divide la isla en varias zonas y fija los requisitos de inversión que los solicitantes deberán hacer para merecer una licencia, además de cumplir los demás requisitos de la ley y los reglamentos, y fija los derechos anuales que las salas pagarán al Estado por su operación. Por autoridad de ley existen el Reglamento de la Administración de Fomento Económico antes mencionado, 15 R.&R.P.R. secs. 76–1 a 76–22, y un Reglamento del Secretario de Hacienda, 15 R.&R.P.R. secs. 76–201 a 76–219.

Para obtener una franquicia en la Zona Núm. 1, que es la zona en donde está ubicada la sala de la demandante, el

Reglamento de la Administración de Fomento Económico exige que el concesionario deberá ser dueño de un hotel u hoteles que deberán tener no menos de 300 habitaciones o cuyo costo deberá ser no menor de cinco millones de dólares, 15 R.&R.P.R. sec. 76–9(1). Las salas de juego ubicadas en dicha zona pagan un derecho de franquicia de $24,000.00 anualmente, 15 L.P.R.A. sec. 76(2).

Todo concesionario deberá tener todos los días que abra las puertas de la sala de juego al público, en caja y en metálico una cantidad no menor de $25,000.00, 15 R.&R.P.R. sec. 76–21, y el cajero liquidará las apuestas, a quienes lo soliciten, en dinero en efectivo, 15 R.&R.P.R. 76a–7(d). Lo que precede no son todas las condiciones y requisitos que la ley y los reglamentos le exigen a los casinos, sino que son algunas que hemos seleccionado para demostrar la fiscalización de que son objeto estas empresas por parte del Estado. Más adelante hemos de hacer referencia a lo que aquí dejamos expuesto. Regresemos por un momento al Código Civil y a la Ley Núm. 221.

Como dijimos en *Serra* v. *Salesian Society*, 84 D.P.R. 322 (1961), lo dispuesto en el Art. 1698 del Código Civil en el sentido de que la ley no concede acción para reclamar lo que se gana en un juego de suerte, "se refiere a los juegos prohibidos; el propio Código aclara en su artículo 1701 que el que pierde en un juego o apuesta de los no prohibidos queda obligado civilmente." Ya desde el año 1903, en *Chevremont* v. *El Pueblo*, 3 D.P.R. 114, sostuvimos que los tenedores de billetes de la Lotería Provincial tenían causa de acción en ley. Posteriormente hemos retirado el principio, *Fuentes* v. *Fulano de Tal*, 84 D.P.R. 506 (1962) y *Mieres* v. *Pagán*, 76 D.P.R. 699 (1954). En *Mieres* v. *Pagán*, supra, sostuvimos el derecho al premio que tenía el dueño de un billete premiado. También repetidas veces hemos sostenido que hay causa de acción en casos de apuestas hípicas, *Díaz* v. *Hipódromo El Comandante*, 87 D.P.R. 809 (1963); *Ortiz* v. *Las Monjas Racing*

*Corporation*, 54 D.P.R. 210 (1939); *Fernández* v. *Las Monjas Racing Corp.*, 52 D.P.R. 787 (1938); *Torres* v. *Porto Rico Racing Corp.*, 40 D.P.R. 441 (1930); *Manzanares* v. *Porto Rico Racing Corp.*, 38 D.P.R. 815 (1928); *Felicie* v. *Porto Rico Racing Corp.*, 38 D.P.R. 475 (1928).

■ Aun en ausencia de lo dispuesto en el Art. 1701 del Código Civil, en el sentido de que el que pierde en un juego no prohibido queda obligado civilmente, cuyo Art. 1701 es suficiente para resolver este caso, interpretaríamos que la Ley Núm. 221 del 1948 aprobada por la Asamblea Legislativa 46 años después que el Código Civil, tiene el efecto de una enmienda implícita al Art. 1698 del Código Civil. Las leyes que se refieren a la misma materia, o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, para cuando lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro, Art. 18 del Código Civil, 31 L.P.R.A. sec. 18. Pero no es necesario recurrir al argumento de la enmienda implícita porque, como ya hemos señalado, el Art. 1701 del propio Código Civil dispone que el que pierde en un juego no prohibido queda obligado civilmente.

■ Además, no es posible imputarle al Gobierno de Puerto Rico la posición poco seria de que mientras por un lado le exige a unas personas, como condiciones para concederle una franquicia de juego, una inversión de no menos de $5,000,000.00 ó su equivalente en la construcción de un hotel de no menos de 300 habitaciones, el mantenimiento de un hotel de turismo dentro de las normas más estrictas del ramo, mientras le cobra $24,000.00 anuales por dicha franquicia, mientras le exige que pague de contado a los jugadores que ganan en la sala de juego, y mientras las autoriza expresamente por reglamentación que tiene fuerza de ley a extender crédito a los jugadores, que por otro lado cuando esas personas que han cumplido esas condiciones y pagado esos dineros se ven en la necesidad de recurrir al Estado, a través

de su Rama Judicial, para hacer valer sus derechos creados bajo ley, que entonces el Estado tome la posición de que esas personas no tienen remedio legal. El derecho no concibe que las personas se tomen la justicia por su mano ni permite, siempre que sea posible evitarlo, lagunas en la ley. Si éstas aparecen en la legislación, se suplen mediante la jurisprudencia. No se cometieron los tres primeros errores señalados. El demandado jugó juegos permitidos por la ley y quedó civilmente obligado, Art. 1701 del Código Civil, 31 L.P.R.A. sec. 4774.

El Tribunal Supremo de España ante una situación un tanto parecida a la que aquí confrontamos resolvió en el mismo sentido en que aquí lo hemos hecho y utilizó un razonamiento parecido al nuestro. Dijo el tribunal:

"[S]ería contradictorio en el orden moral, que es el que rige la licitud de los actos, apreciar como contrario a aquél la realización de los que el legislador autoriza, no pudiendo, por lo tanto, conceptuarse comprendidas entre las prohibiciones del Código civil las operaciones de Bolsa que se ajusten a los términos del art. 74 del Código de comercio." Sentencia de 26 de diciembre de 1905.

En el cuarto error señalado se argumenta que erró el tribunal al declarar con lugar la demanda, o en la alternativa, al no reducir la cuantía de la deuda. No estamos de acuerdo. El segundo párrafo del Art. 1701 del Código Civil, 31 L.P.R.A. sec. 4774, no es mandatorio sino discrecional. Expresa que la autoridad judicial *puede* reducir la obligación, etc.; no expresa que *debe*. El Tribunal Superior ejerció su discreción y dadas las circunstancias de este caso no tenemos razones que justifiquen nuestra intervención con el ejercicio válido de discreción por parte del Tribunal Superior. El demandado es un jugador bastante habitual; cobraba las ganancias en efectivo y firmaba obligaciones cuando perdía; no se trata de una persona ignorante que justifique una actitud paternalista de parte del tribunal, es un abogado

que ejerce su profesión en una de las grandes ciudades del mundo. No se cometió el error señalado.

■ Se expresa en el quinto error señalado que el tribunal erró al condenar al recurrente al pago de $1,000.00 por concepto de honorarios de abogado ya que el recurrente no ha sido temerario al litigar. Somos de opinión que este error se cometió. Después de todo, el punto no había sido resuelto antes. *Santaella* v. *Licari*, 83 D.P.R. 887, 903 *in fine* (1961).

*La sentencia dictada por el Tribunal Superior, Sala de San Juan, en 9 de octubre de 1962 se modificará eliminándole la condena al demandado a pagar a la demandante $1,000.00 por concepto de honorarios de abogado y así modificada se confirmará.*