JULIO D. SILVA, recurrente, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, ETC., demandada; FONDO DEL SEGURO DEL ESTADO, interventor.

*Número:* CI-64-13      *Resuelto:* 11 de marzo de 1965

*Enrique Báez García*, abogado del recurrente; *Donald R. Dexter*, abogado del Fondo del Seguro del Estado.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Este caso es de relativamente poca importancia material pero plantea un problema ético-jurídico sobre el cual debemos pronunciarnos. Los hechos pueden resumirse como sigue. Silva, patrono asegurado con el Fondo del Seguro del Estado, contrató los servicios de Vicente López para que, con otros operarios, le hiciese una reparación en una casa suya. Vicente López, carpintero, fue autorizado por Silva para obtener los servicios de un ayudante de carpintero. Así lo hizo López pero poco tiempo después de empezarse los trabajos, el ayudante de carpintero enfermó. López se lo comunicó a Silva y éste le dijo que se buscase otro. López trajo a su hijo Roberto al trabajo en calidad de ayudante de carpintero. En dicho trabajo Roberto sufrió un accidente. El Administrador del Fondo del Seguro del Estado le concedió una indemnización de $2,250.00.

Once meses después el padre y el menor recurrieron al Fondo para cobrar del patrono la penalidad que impone la ley en caso de menores de 18 años empleados ilegalmente, cuya penalidad es igual a la suma que como compensación ordina-

riamente le correspondería al obrero lesionado en cada caso particular. Art. 3, Ley Núm. 45 de 18 de abril de 1935, según enmendada; 11 L.P.R.A. sec. 3, ed. 1962, pág. 31. En este caso dicha penalidad sería, pues, de $2,250.00. El Administrador se la impuso al patrono y éste, por no estar conforme con la misma, recurrió a la Comisión Industrial.

En la Comisión el caso se vio ante uno de los tres Comisionados, o sea, la Presidenta Lcda. Raquel Nigaglioni. Por las razones que en breve se verán la Presidenta falló a favor del patrono pero al no estar los otros dos Comisionados de acuerdo con su fallo, la resolución de la Presidenta se volvió opinión disidente y el voto de los otros dos Comisionados prevaleció.

Lo que hemos relatado hasta ahora sobre los hechos del caso no está en controversia. Sin embargo la Comisión se dividió porque hay un conflicto en la prueba que tuvo ante sí la Comisión. Dicho conflicto estriba en lo siguiente. El menor Roberto López declaró que el patrono nunca le preguntó la edad; que trabajó sólo 2 días para dicho patrono porque en el segundo día le ocurrió el accidente. Al explicar la forma en que vino a trabajar con Silva dijo "El mandó a buscar a mi papá, que era el carpintero, y le dijo que se buscara un ayudante y mi papá me buscó a mí." Declaró además que él no tenía tarjeta de seguro social para esa fecha. El padre, Vicente López, declaró que él no le dijo al patrono que su hijo no tenía permiso del Departamento del Trabajo;[1] que él le dijo al patrono que su hijo tenía 17 años y que Silva le dijo que lo pusiese a trabajar; que su hijo tenía tarjeta del seguro social; que el patrono no le pidió que le mostrase la tarjeta del seguro social del menor pero que él le dijo al patrono que la tenía; que él (el padre) la tenía en los bolsillos cuando habló con Silva.

---

[1] Permiso requerido por la ley por ser éste menor de 18 años, 29 L.P.R.A. secs. 431 y ss.

El patrono Silva declaró que él nunca entrevistó al menor porque sus horas de trabajo en el correo de Mayagüez se lo impidieron; que al enfermarse el ayudante del carpintero él autorizó a Vicente López a que se consiguiese otro y que entonces López le dijo que él tenía un hijo de 18 años, que había trabajado anteriormente y que tenía tarjeta de seguro social; que él le preguntó al padre la edad de su hijo Roberto y aquél le contestó que tenía 18 años; que él creyó lo que el padre le dijo.

Surge también de la prueba que cuando se investigaba el caso a los fines de Roberto López cobrar del Fondo del Seguro la indemnización que le concedió el Administrador, Roberto prestó una declaración jurada en la cual, al serle preguntada su edad, declaró que tenía 18 años. El padre, Vicente López, prestó otra declaración jurada ante el investigador del Fondo y al preguntársele por quién había sido contratado Roberto para trabajar en la reparación de la casa de Silva, Vicente López contestó lo siguiente: "El [Silva] me dijo que me buscara un muchacho y le dije bueno, si se va a buscar un muchacho yo tengo el hijo mío, que tiene 17 años, y tenía 16 años nada más, y él me dijo que lo llevara."

También surge de la prueba que Roberto López, a pesar de ser menor de 18 años, había trabajado con otros patronos antes y después del accidente que motivó este caso y en esas ocasiones Roberto y/o su padre mentían sobre la edad del menor y utilizaban el ardid de la tarjeta de seguro social.

La posición del patrono querellado es que él fue engañado en cuanto a la edad de Roberto López y que no debe penalizársele por un error al cual fue inducido por los que ahora pretenden beneficiarse de su conducta engañosa. Esa, en esencia, es la posición de la Presidenta de la Comisión Industrial. La posición de los dos Comisionados, que prevaleció, es que la ley prohibe emplear menores de 18 años; ([2]) que el

---

([2]) Con excepciones que no son aquí pertinentes, 29 L.P.R.A. secs. 431 y ss.

patrono violó la ley al emplear al menor Roberto López; que por ello debe pagar la penalidad impuéstale; que el patrono no puede levantar la defensa de haber sido engañado sobre la edad del menor porque "para que pueda prosperar esta defensa la ley exige que la manifestación se haga en declaración jurada según el caso de *Sucn. Lledó* v. *Comisión Industrial*, 65 D.P.R. 430 (1945)"; y no puede alegarse con éxito la doctrina de enriquecimiento injusto porque la misma es "extraña" a la Ley de Compensaciones por Accidentes del Trabajo.

Vamos a fallar a favor del querellado recurrente y a continuación expresamos los fundamentos de nuestro fallo.

En primer lugar, la opinión mayoritaria de la Comisión se equivoca al expresar que el patrono no puede levantar la defensa de haber sido engañado y al añadir que la ley exige que la manifestación engañosa debe aparecer hecha mediante declaración jurada. Al resolver así la Comisión este caso, en 19 de febrero de 1964, cuyos hechos ocurrieron en octubre de 1961, aparentemente leyó el texto del artículo tercero de la Ley de Compensaciones por Accidentes del Trabajo, Ley Núm. 45 de 18 de abril de 1935, según había sido enmendado por la Ley Núm. 162 de 14 de mayo de 1943, Leyes, pág. 549, cuyo texto en efecto exigía el requisito de la declaración jurada, pero ésa ya no es la ley vigente ni lo era cuando ocurrieron los hechos de este caso ni cuando la Comisión falló. Ese requisito fue eliminado, al enmendarse dicho artículo tercero, mediante la Ley Núm. 284 de 15 de mayo de 1945, Leyes, pág. 1057. El caso de *Sucn. Lledó* v. *Comisión Industrial*, supra, citado por la Comisión fue resuelto bajo la ley de 1943 y por consiguiente ya no tiene vigencia en ese aspecto. Así lo expresamos en *Roig* v. *Comisión Industrial*, 88 D.P.R. 60 (1963). Además, si acaso fuese la intención legislativa prohibir que el patrono se defendiese en esas circunstancias ¿por qué dispone la ley, luego de proveer para esa compensación adicional que "el Administrador del Fondo del Seguro del Estado, antes de proceder al

cobro de dicha compensación adicional al patrono, dará traslado del expediente a la Comisión Industrial, para que ésta dé, tanto al patrono como al obrero, oportunidad de ser oídos y defenderse."? Leyes de 1943, pág. 549; Leyes de 1945, pág. 1057; Leyes de 1953, pág. 431; Leyes de 1957, pág. 490; Leyes de 1960, pág. 303; 11 L.P.R.A. sec. 3, ed. de 1962, pág. 32.

Recuérdese que la citada Ley de Compensaciones por Accidentes del Trabajo del año 1935, nada dispuso sobre compensación adicional para casos de menores de 18 años. La enmienda hecha a dicha ley mediante la Ley Núm. 74 de 26 de abril de 1940 no tocó ese aspecto. Fue mediante la Ley Núm. 52 de 25 de abril de 1942, Leyes, pág. 519, que se insertó por primera vez esa penalidad de la compensación adicional a ser pagada por el patrono. Mediante la antes citada Ley Núm. 162 del año 1943 se insertaron las llamadas dos únicas defensas pero eso fue eliminado mediante la citada Ley Núm. 284 de 1945. No se alteró, sin embargo, la disposición que da derecho al obrero y al patrono de ser oídos y de defenderse ante la Comisión Industrial.

■ En segundo lugar, sostenemos la apreciación que de la prueba hizo la Presidenta de la Comisión, quien fue el único miembro de dicho organismo que vio y oyó declarar a los testigos. Creemos que se expresó con acierto la Presidenta de la Comisión al escribir en su voto disidente lo que sigue:

"Tenemos la facultad y el deber de dar al patrono 'la oportunidad de ser oído y defenderse', y la defensa del patrono es que no tiene responsabilidad de pagar la compensación adicional ya que el que fue inducido a error por parte del padre del lesionado y del lesionado mismo para ocultar la verdadera edad del menor. Al examinar la prueba hay que considerar que actuamos en este caso como Ponente. Es decir, tuvimos la oportunidad de presidir la vista careándonos con los testigos y con sus declaraciones. Factor importante que no se debe pasar por alto pues se tiene la oportunidad de percibir las actitudes, vacilaciones, modulaciones, gestos, etc. For esto, la conducta en la silla testifical es muchas

veces factor decisivo en la resolución de un caso. Fue por esta circunstancia que expresamos en nuestros voto anterior que el padre al igual que su hijo nos dieron la impresión de ser testigos poco convincentes en su testimonio. Es decir, el Ponente no puede pasar por alto este hecho y ceñirse estrictamente al récord taquigráfico sin evaluar lo anterior."

Aun de la lectura de la transcripción de evidencia y de las declaraciones juradas de Víctor López, Roberto López y Julio Silva, hemos llegado a la misma conclusión que llegó la Presidenta. De los referidos documentos surge claro e inexpugnable que Víctor López no le dijo la verdad a Julio Silva y que Roberto López le mintió bajo juramento al investigador del Fondo del Seguro del Estado.

En tercer lugar, no estamos de acuerdo con la posición mayoritaria de la Comisión, adoptada en este caso, en el sentido de que la doctrina de enriquecimiento injusto no se aplica en este campo por ser extraña al mismo. Si nos bastase con citar el precedente podríamos concluir aquí la discusión de ese argumento citando el caso de *Compañía Popular* v. *Corte*, 63 D.P.R. 121 (1944) en el cual ya aplicamos en el derecho laboral dicha doctrina de enriquecimiento injusto, pero nos interesa considerar el argumento en sus méritos porque como posición jurídico-filosófica tenemos que rechazarlo.

Al considerar la doctrina de enriquecimiento injusto debe tenerse en mente enseguida que no se trata de una regla particular de una ley, para ser aplicada solamente a la situación específica descrita en el estatuto, situación que puede darse una o repetidas veces. Ejemplo de lo dicho sería el Art. 700 del Código Civil que dispone "Cuando el testador llame a la sucesión a una persona y a sus hijos, se entenderán todos instituídos simultánea y no sucesivamente." 31 L.P.R.A. sec. 2289. He ahí una regla dictada para una situación específica. Difícilmente se podrá aplicar ese artículo a otras situaciones no comprendidas en sus propios términos.

■ No ocurre así con el principio que nos ocupa. Es ésta una doctrina o principio general de derecho que puede

aplicarse a situaciones muy distintas entre sí, siempre y cuando tengan en común un elemento: el que de no aplicarse se perpetraría la inequidad de que alguien se enriqueciese injustamente en perjuicio de otro. Se trata de una doctrina general basada en la equidad, (³) reconocida por el derecho de todos los países civilizados, (⁴) que domina muchas relaciones de derecho privado y cada día dominará más, (⁵) susceptible de aplicación en múltiples casos que son imposibles de prever. (⁶)

Es cierto que tradicionalmente se discutía esta doctrina en los tratados con motivo de los contratos y quasi contratos pero ya se le considera, como debe ser, como un principio general que opera en todo el ámbito del derecho y el cual no está basado en la existencia de un contrato. (⁷) Creemos que un breve recuento histórico arroja luz sobre estos conceptos.

La doctrina de enriquecimiento injusto es casi tan antigua como el derecho mismo. Es un corolario del concepto de equidad, lo cual equivale a decir que es un corolario del concepto de la justicia mismo.

■ La equidad, como se sabe, quiere decir algo que es justo. Como concepto operante en la aplicación y en el de-

---

(³) *Compañía Popular* v. *Corte*, 63 D.P.R. 121, 129 (1944); Castán, *Derecho Civil Español, Común y Foral*, 9na. ed., Tomo I, Vol. II, pág. 570; Valverde, *Tratado de Derecho Civil Español*, 3ra. ed., Vol. III, pág. 643; Allen, *Law in the Making*, 3ra. ed., pág. 318; Pound, *Jurisprudence*, Tomo I, pág. 415; Planiol, *Tratado Elemental de Derecho Civil*, trad. española de la 12a. ed. francesa, México, Vol. VI, pág. 617 (1945).

(⁴) *Compañía Popular* v. *Corte*, supra, pág. 129; Valverde, *ibid.*; Puig Brutau, *Fundamentos de Derecho Civil*, Tomo II, Vol. II, pág. 605; Friedmann, *Legal Theory*, 4ta. ed., pág. 506; Allen, obra citada, pág. 329; Friedmann, *Law in a Changing Society*, pág. 456 (1959).

(⁵) *Compañía Popular* v. *Corte*, supra, pág. 128; Valverde, *ibid*; Planiol, *ibid.*

(⁶) Valverde, *ibid*; Castán, *ibid*, pág. 572; Nicholas, *"Unjustified Enrichment in the Civil Law and Louisiana Law,"* 36 Tul. L. Rev. 605, 606 (1962).

(⁷) *Compañía Popular* v. *Corte*, supra, pág. 129; Planiol y Ripert, *Tratado Práctico de Derecho Civil Francés*, Tomo VIII, pág. 53, ed. Cultural, Habana.

sarrollo del derecho la equidad nos llega a Puerto Rico por el derecho civil, o romanizado, europeo continental, o sea, por el derecho civil español. Recuérdese el famoso artículo de casi todos los códigos civiles, que en el nuestro lleva el Núm. 7, el cual dispone que "Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos." En el derecho anglosajón, antes de bifurcarse el derecho inglés por los dos caminos del *common law* y la *Equity*, ambas corrientes del derecho estaban en Inglaterra, como en la Europa continental, fundidas en una sola. Fue por razones meramente históricas, y no por razones teóricamente necesarias, que ocurrió dicha bifurcación en el derecho inglés (para refundirse otra vez ambas corrientes en el moderno derecho norteamericano en donde en muchas jurisdicciones ya no están separadas). En el derecho europeo continental, civil o romanizado no se operó esa división y por ello ahora como antes, la equidad es levadura que propicia el desarrollo del derecho civil dentro de sí mismo, sin ser una rama o jurisdicción separada.

Como hemos sugerido, así era al comienzo. Aunque en Roma también existió el dualismo entre un derecho formal o derecho estricto y un derecho equitativo, allí el *ius civile* y el *ius praetorium* eran aplicados por el mismo tribunal. El derecho inglés, antes de sufrir la bifurcación que hemos mencionado, recibió considerable aportación de los derechos romano y canónico, siendo parte de ella el influjo que tuvo la *aequitas* romanocanónica en el desarrollo inicial de la *Equity* inglesa. Antes de la Reforma los cancilleres (Jueces de los Tribunales de Equidad) habían sido casi siempre escogidos de entre los eclesiásticos los cuales habían estudiado en las escuelas de derecho romano y de filosofía escolástica y fueron ellos los que principalmente formaron la *Equity* como un sistema supletorio de la *common law*. Por eso, como hemos

señalado antes, (⁸) no puede extrañarnos que la *Equity* inglesa tuviera su base en la *aequitas* romanocanónica, de la cual viene a ser una continuación. Esas primeras cortes de equidad inglesas eran también llamadas *cortes de conciencia* debido a su función mitigadora y correctora del *common law*, función que desempeñaron mejor antes de que sus procedimientos se congelasen en fórmulas rígidas. El excesivo formalismo que luego cobró la *Equity* destruyó en gran parte su esencia y propósito. Desde luego, ya la ciencia jurídica moderna ha reivindicado la sustancia del derecho colocándola en la posición superior, que como valor ético y jurídico, le corresponde en relación con las formalidades. (⁹)

Por ser muy antiguo, es imposible decir qué pensador articuló por primera vez en su mente y propuso el concepto de equidad en relación con la aplicación de la ley. Nos parece cosa segura que a muchos se les ocurriese dicho concepto al venir en contacto con el Código de Hammurabi hace aproximadamente 4,000 años. Limitando nuestra mirada a las fuentes directas de nuestro pensamiento occidental, encontramos discusiones de este concepto en la Grecia clásica y específicamente en Platón y Aristóteles. Como el concepto de la equidad en nuestro derecho siempre fue y continúa siendo el concepto aristotélico de la mitigación de la ley mediante la equidad para hacer la ley justa, en aquellos casos en que por las circunstancias particulares del caso específico la aplicación de la ley hubiese resultado en una injusticia, (¹⁰) creemos de interés transcribir las propias palabras de Aristóteles sobre este tema. Después de todo, no es con frecuencia que desde nuestra fabril y febril época tendemos la mirada hacia esa aurora

---

(⁸) *United Hotels of P.R.* v. *Willig*, 89 D.P.R. 188 (1963), escolio 2.

(⁹) Allen, *Law in the Making*, 3ra. ed., págs. 305–349; Friedmann, *Legal Theory*, 4ta. ed., págs. 493–496; Castán, *La Formulación Judicial del Derecho*, 2da. ed. (1954), págs. 26–95; Maine, *Ancient Law*, 3ra. ed. americana (1888), págs. 42–69.

(¹⁰) Castán, *La Formulación Judicial del Derecho* (1954) 88; Friedmann, *Legal Theory* (1960) 494.

que fue Grecia y ningún daño hay en que lo hagamos breve-
mente ahora. Dichas palabras son:

"Lo que produce la dificultad [en el caso de la equidad] es
que lo equitativo es en verdad justo, pero no según la ley, sino
que es un enderezamiento de lo justo legal. La causa de esto
está en que toda ley es general, pero tocante a ciertos casos no
es posible promulgar correctamente una disposición en general.
En los casos, pues, en que de necesidad se ha de hablar en general,
por más que no sea posible hacerlo correctamente, la ley toma
en consideración lo que más ordinariamente acaece, sin descono-
cer por ello la posibilidad de error. Y no por ello es menos recta,
porque el error no está en la ley ni en el legislador, sino en la
naturaleza del hecho concreto, porque tal es, directamente, la
materia de las cosas prácticas.

"En consecuencia, cuando la ley hablare en general y sucediere
algo en una circunstancia fuera de lo general, se procederá recta-
mente corrigiendo la omisión en aquella parte en que el legislador
faltó y erró por haber hablado en términos absolutos, porque si
el legislador mismo estuviere así presente, así lo habría declarado,
y de haberlo sabido, así lo habría legislado.

"Por tanto, lo equitativo es justo, y aún es mejor que cierta
especie de lo justo, no mejor que lo justo en absoluto, sino mejor
que el error resultante de los términos absolutos empleados por
la ley. Y esta es la naturaleza de lo equitativo: ser una rectifica-
ción de la ley en la parte en que ésta es deficiente por su carácter
general."—*Ética Nicomaquea,* trad. española de Gómez Robledo,
México (1954) pág. 363.

Pasando al Derecho Romano, son bien conocidas las senten-
cias de Pomponio recogidas en el *Corpus Juris Civiles:* "[*E*]*s*
equitativo naturalmente, que nadie se haga más rico con per-
juicio de otro." Digesto 12.6.14. "Es justo por derecho natural,
que nadie se haga más rico con detrimento e injuria de otro."
Digesto 50.17.206. Para remediar esa "lesión a la equidad,"
como llama Castán al enriquecimiento injusto, (11) el derecho
romano concedió un número de acciones llamadas *condictiones.*
Las soluciones romanas pasaron al antiguo derecho común

---

(11) Obra y tomo citados, pág. 570.

español.([12]) El Código Civil español, a diferencia del alemán, no proveyó una organización sistemática de esta materia sino que el concepto está disperso en su articulado. Igualmente ocurre en nuestro Código Civil, lo cual se explica ya que el nuestro procede del español. Así, el profesor Velázquez comentando nuestro Código señala lo siguiente:

"Uno de los principios fundamentales que informan el Código Civil es, en efecto, que nadie debe enriquecerse injustamente en perjuicio de otro.

"Tal principio no se halla consagrado expresamente en el Código Civil. Pero hace numerosas aplicaciones del mismo. Véanse, en efecto, los artículos 296, 297, 300, 301 (31 L.P.R.A. secs. 1163, 1164, 1167, 1168), relativos a la accesión; 381, 382, 383 y 384 (31 L.P.R.A. secs. 1467 a 1470), relativos a la posesión; 1117 (31 L.P.R.A. sec. 3167), relativo al pago; 1304 (31 L.P.R.A. sec. 3644), relativo a los bienes gananciales; 1407 (31 L.P.R.A. sec. 3912), relativo al retracto; 1679 (31 L.P.R.A. sec. 4681), relativo al depósito; 1766 (31 L.P.R.A. sec. 5025), relativo a la prenda; etc. Y, sobre todo, véanse los artículos 1795 a 1801 (31 L.P.R.A. secs. 5221 a 5127) relativos al cobro de lo indebido. Ante la multiplicidad de estos textos especiales es forzoso admitir que el Código Civil encierra un conjunto de disposiciones que demuestran que el legislador ha reconocido de un modo general la existencia del principio referido. Además, conforme dice Planiol, dicho principio se impone como una regla necesaria de equidad, siendo 'una de esas raras reglas de derecho natural que dominan todas las leyes, aun cuando el legislador no se haya tomado especialmente el cuidado de formularlas'."—*Las Obligaciones Según el Derecho Puertorriqueño* (1964) pág. 133.

Así pues, como observa Puig Brutau el derecho relativo a enriquecimiento injusto es un derecho que todavía se está formando al nivel de los casos resueltos en la práctica.([13])

Luego de esas consideraciones sobre el desarrollo de estos conceptos llegamos al caso de autos. Ante el engaño de los reclamantes la Comisión cree que debemos aplicar ciegamente

---

([12]) Como se sabe, hay en España también un derecho común, el cual no debe confundirse con el *common law* anglosajón.

([13]) Obra y tomo citados, pág. 606.

la letra de la ley e imponerle al querellado engañado la penalidad económica para beneficio de los autores del engaño. No estamos dispuestos a hacer eso. En el derecho romano se le llamaba *subtilitas*, al vicio de invocar la aplicación de la ley al pie de la letra con el propósito de obtener una ventaja indebida. La *subtilitas* era considerada como una forma de *dolus malus* y demás está decir que la justicia y el derecho no le dan cuartel al *dolus malus*. (14) *Fraus et jus nunquam cohabitant.*

Como bien señala Castán "las ideas de justicia y equidad son esenciales y consustanciales a la noción del Derecho, el cual dejaría de cumplir sus finalidades morales y sociales si no aspirase a realizar la justicia, y no una justicia abstracta y teórica, sino una justicia realista y humana . . . ." Una "exigencia insustituíble" llama dicho autor el uso de la equidad. "En sustancia," dice dicho autor, "el juez debe obediencia a la ley, y la mejor manera de servirla es la de realizarla en su idea animadora, esto es en la justicia, que constituye su profundo contenido." (15)

Argumenta la opinión mayoritaria, como dijimos antes, que la doctrina de enriquecimiento injusto no se aplica en este campo. Hemos visto que no es así. El derecho no está dividido en compartimientos herméticos. Lo que ocurre es que para fines didácticos y de exposición el derecho se clasifica en materias pero éstas crecen y se enriquecen con los desarrollos habidos en todo el campo del derecho y las nuevas tendencias en una materia tienen influjo en las otras. (16)

(14) Allen, obra citada, pág. 319.

(15) *La Formulación Judicial del Derecho* (1954) págs. 87, 102 y 115.

(16) Véanse por ejemplo los últimos desarrollos en daños y perjuicios y seguros sociales debidos a las tendencias socializadoras del derecho contemporáneo en Friedmann, *Law in a Changing Society* (1959). V. también Rodríguez Arias, *"Orientaciones Modernas del Derecho Civil"* en Revista General de Legislación y Jurisprudencia (1964) pág. 393; a Castán, *"La Socialización del Derecho"* en la misma revista (1915) págs. 279–280; y Castán en *La Ordenación Sistemática del Derecho* (1954) pág. 121.

En cuanto a las grandes doctrinas del derecho, son estas ideas subyacentes que forman el basamento de todo el derecho. Todo sistema de derecho que merezca tal nombre está basado en un ideal de justicia, el contenido del cual a su vez depende de valores éticos, políticos y sociales; ([17]) y como bien ha expresado Del Vecchio debe existir una relación entre los principios generales y las normas particulares del derecho—y las decisiones judiciales, creemos nosotros—de forma que entre unos y otros no haya desarmonía. ([18])

■ No hay duda de que los querellantes están impedidos de ir contra sus propios actos. Este principio, también basado en fundamentos éticos y equitativos, también permea todo el derecho. Su aplicación supone desde luego, una intervención decidida del arbitrio judicial. Como señala Puig Brutau, "quien ha dado lugar a la situación engañosa . . . no puede hacer que su derecho prevalezca por encima del derecho de quien ha depositado su confianza en aquella apariencia." ([19]) Como se sabe, el equivalente en el derecho anglosajón de la doctrina de los actos propios de nuestro derecho, es la doctrina del *estoppel*. Para una interesante comparación de ambas ideas puede verse el citado libro de Puig Brutau, *Estudios de Derecho Comparado*, págs. 97–136.

Estamos conscientes de que es más fácil ser generoso que ser justo, pero nuestro sentido del deber nos impide tomar el camino más fácil si éste está reñido con la justicia. No podemos imponerle una sentencia al querellado por hechos motivados por el engaño cometido por los querellantes y mucho menos cuando los beneficiarios de dicha sentencia resultarían ser los autores del engaño. De haber ocurrido esta situación sería un caso claro de enriquecimiento injusto y no hay duda de que hubiésemos podido curar esa "lesión a la equidad." De

---

([17]) Friedmann, *Legal Theory*, 4ta. ed., pág. 503.

([18]) *Los Principios Generales del Derecho*, 2da. ed. española, trad. de Ossorio Morales (1948) pág. 61.

([19]) *Estudios de Derecho Comparado* (1951) pág. 103.

igual manera podemos evitarla. Conviene recordar el siguiente pensamiento de Del Vecchio: "El jurista, y muy especialmente el juez, debe—en cuanto ello es posible—dominar y casi dar vida de nuevo a todo el sistema, sentir su unidad espiritual, desde las premisas remotas y tácitas hasta los preceptos más insignificantes, como si fuese autor de todo ello y por él hablase la misma ley; en este sentido podríamos hacer nuestro el sublime ideal en que se inspiraba Aristóteles definiendo al juez como lo justo viviente." [20]

En resumen: (1) En situaciones similares las partes pueden levantar defensas al utilizar la "oportunidad de ser oídas y defenderse" que les da la ley; (2) en este caso en particular la defensa levantada por el querellado es suficiente y fue probada; (3) en este campo, cuando sea necesario a los fines de hacer justicia, puede aplicarse la doctrina de enriquecimiento injusto.

*Se revocará la Resolución de la Comisión Industrial dictada en este caso.*