# 2002 DTA 101

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL VI DE CAGUAS/HUMACAO/GUAYAMA
PANEL SUSTITUTO**

COMPAÑIA MATRIZ DE LOS COLONOS DE LA CENTRAL ROIG, INC., REPRESENTADA POR SU PRESIDENTE, LUIS A. PINTO CRUZ
Apelante

v.

HON. FERNANDO TOLEDO, SECRETARIO DE AGRICULTURA DEL ESTADO LIBRE ASOCIADO DE PR, REPRESENTADO POR LA HON. SECRETARIA DE JUSTICIA; CARLOS BOUET BLASINI; MARCELINO FERRER ALBERTY; LEOPOLDO PEDRAZA Y RENE DE LEON MARTINEZ
Apelados

AGROINDUSTRIA AZUCARERA DEL OESTE, INC.; FINTECH RESOURCES, INC.
Interventoras-Apeladas

Núm. KLAN-2001-01258

San Juan, Puerto Rico, a 28 de mayo de 2002

Panel integrado por su Presidente, el Juez Soler Aquino
y los Jueces Colón Birriel y Escribano Medina

Colón Birriel, Juez Ponente

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## TEXTO COMPLETO DE LA SENTENCIA

### I

El apelante Luis A. Pinto Cruz (en lo sucesivo *"Pinto Cruz"*) solicita la revocación de una **Sentencia** dictada por el Tribunal de Primera Instancia, Sala Superior de Humacao (el *"Tribunal"*), el 9 de noviembre de 2001, notificada el 15 del mismo mes y año; en el caso de *Compañía Matriz de los Colonos de la Central Roig, Inc. representada por su Presidente Luis A. Pinto Cruz v. Honorable Fernando Toledo, et al.,* Civil Número HPE 2001-0167. El dictamen desestimó una demanda presentada por Pinto Cruz contra el Secretario del Departamento de Agricultura y otros, condenando a Pinto Cruz al pago de las costas y $500 por concepto de honorarios de abogado. Además, declaró **Ha Lugar** una reconvención presentada por los codemandados Carlos Bouet Blasini, Marcelino Ferrer Alberty, Leopoldo Pedraza Algarín y René de León Cuadrado; (en lo sucesivo los *"apelados"*). Por su parte, los apelados presentaron su alegato, haciendo lo propio Agroindustria Azucarera del Oeste, Inc. y otros, interventoras-apeladas. Con el beneficio de los escritos, resolvemos, no sin antes exponer el trasfondo fáctico y procesal acontecido en el Tribunal.

### II

El 7 de septiembre de 2001, Pinto Cruz, como Presidente de la Compañía Matriz de los Colonos de la Central Roig, Inc. (en lo sucesivo la *"corporación"*), presentó demanda sobre nulidad de contrato y de *injunction* permanente, conjuntamente con petición de entredicho provisional y de *injunction* preliminar contra el Secretario de Agricultura y otros. Alegó, en esencia, que el 31 de julio de 1997 (y sin que se hubiera inscrito la corporación en el Departamento de Estado), fue otorgada la Escritura Número 15 de Fideicomiso ante el Notario Jacobo Ortiz Murias, mediante la cual un grupo de alegados accionistas de la antes referida corporación, suscribieron un fideicomiso de votos, constituyendo como fiduciarios a los apelados Carlos Bouet Blasini, Marcelino Ferrer Alberty, Leopoldo Pedraza Algarín y René de León Cuadrado. Siguió alegando, que la referida escritura era nula e inoperante, toda vez que al momento de otorgarse, la corporación era inexistente y por lo tanto, no habían accionistas que pudieran transmitir su derecho al voto. Por su parte, los apelados presentaron su **Contestación a Demanda Enmendada** en la que, entre otras cosas, alegaron que: (1) la demanda estaba prescrita; (2) Pinto Cruz carecía de legitimación activa para comparecer en nombre de la corporación; (3) el contrato de fideicomiso de votos cumple con todos los requisitos legales, y que (4) Pinto Cruz pretendía ir contra sus propios actos, ya que había cedido a los fiduciarios el derecho al voto de sus acciones mediante escritura pública otorgada con posterioridad a la radicación ante el Departamento de Estado del Certificado de Incorporación de la susodicha corporación.

Además, los apelados presentaron una **Reconvención** contra Pinto Cruz alegando que:

*"1. En septiembre de 1996, entró en vigor la Ley de Transferencias de Activos y Pasivos para la Negociación de la Corporación Azucarera de la Autoridad de Tierras de Puerto Rico."*

*2. La Ley proveía para la transferencia a los colonos de caña de azúcar de ciertos activos necesarios para la elaboración y producción de azúcar, así como de las operaciones para la elaboración de dicho producto.*

*3. Con el propósito de desarrollar al máximo la industria del azúcar, y para cumplir con los requisitos de la Ley, los colonos acordaron que los negocios y actividades relacionadas con la industria de la caña de azúcar se hicieran a través de un ente jurídico llamado Compañía Matriz de los Colonos de la Central Roig, Inc. en el cual todos ellos serían accionistas.*

*4. Como parte de la creación de la Compañía, todos los colonos acordaron, mediante escritura de fideicomiso de votos otorgada el 31 de julio de 1997, ceder a favor de cinco (5) de ellos, llamados fiduciarios, el derecho de votar dichas acciones y de dirigir las riendas de la Compañía por un período de tiempo determinado.*

*5. Luego de incorporada la Compañía, un nuevo grupo de colonos, entre los que se encontraba Luis Pinto Cruz, ingresaron a ésta como accionistas. El 30 de enero de 1998, éstos nuevos accionistas otorgaron otra escritura de fideicomiso de votos en la cual cedieron el derecho al voto de sus acciones a los fiduciarios.*

*6. Las determinaciones de quien ocupa qué cargo en la dirección de la Compañía recae exclusivamente en los fiduciarios. Los demás accionistas, por virtud de los fideicomisos de voto que otorgaron, no tienen facultad para elegir los directores u oficiales de la Compañía.*

*7. El 24 de julio de 2001, un grupo de accionistas, entre los que no se encontraba algún fiduciario, celebraron una supuesta asamblea de accionistas en la que, entre otras cosas, se eligió a Pinto Cruz como Presidente de la Compañía y se eligió a otras personas como oficiales de ésta.*

*8. Dicha elección es nula y ultra vires debido a que los accionistas que allí participaron no tienen la facultad de elegir los directores u oficiales de la Compañía.*

*[...]"*

Así las cosas, el 21 de septiembre de 2001, fue celebrada la vista de *injunction* preliminar. En esa ocasión, los apelados notificaron a Pinto Cruz copia de la contestación a la demanda y una moción solicitando sentencia sumaria Las partes estipularon una serie de hechos ■ y se presentó el testimonio de Pinto Cruz. Además, el Tribunal permitió la comparecencia de AGRASO, Inc. y de Fin Tech Resources, Inc. como interventoras; declaró no ha lugar la solicitud de *injunction* preliminar por no haberse prestado la fianza, y concedió a Pinto Cruz término de cinco (5) días para replicar a la solicitud de sentencia sumaria presentada por los apelados. Así las cosas, el 28 de septiembre de 2001, Pinto Cruz presentó escrito intitulado **Oposición a Solicitud de Sentencia Sumaria y Solicitud de Sentencia Sumaria y Reconsideración**, la que replicaron los apelados. De igual forma, las interventoras AGRASO, Inc. y Fin Tech Resources, Inc., se opusieron al escrito de Pinto Cruz. Finalmente, el 9 de noviembre de 2001, el Tribunal dictó la **Sentencia** que nos ocupa en la que, como indicamos anteriormente, se desestimó la demanda presentada por Pinto Cruz, con la imposición a éste del pago de las costas y $500 por concepto de honorarios de abogado, y declaró Ha Lugar la reconvención presentada por los apelados. Inconforme, Pinto Cruz recurre alegando que el Tribunal incurrió en los siguientes errores.

*"1. Erró el Honorable Tribunal de Instancia al desestimar la demanda por falta de legitimación activa de la parte demandante para impugnar la Escritura Número Quince (15) de Fideicomiso, otorgada el 31 de julio de 1997, en la ciudad de Humacao, Puerto Rico, ante el Notario Jacobo Ortiz Murias.*

*2. Erró el Honorable Tribunal de Instancia al declarar válido el fideicomiso de votos.*

*3. Erró el Honorable Tribunal de Instancia al desestimar la demanda por prescripción.*

*4. Erró el Honorable Tribunal de Instancia al resolver que el fideicomiso de votos fue ratificado.*

*5. Erró el Honorable Tribunal de Instancia al declarar con lugar la reconvención e imponer honorarios de abogado a la parte demandante.*

*6. Erró el Honorable Tribunal de Instancia al desestimar la demanda sin la celebración de una vista en sus méritos."*

## III

Por estar relacionados los primeros cuatro errores en cuanto a la validez del Fideicomiso de Votos suscrito, y con la correspondiente acción de impugnación del mismo, procederemos a discutirlos en conjunto. Veamos.

El fideicomiso de votos o el voto en fideicomiso (*"voting trust"*) es un acuerdo entre los accionistas de una corporación mediante el cual se separa el derecho al voto de los otros derechos que se derivan de la titularidad de las acciones. Esto es, los accionistas transfieren a uno o más fiduciarios el derecho al voto de sus acciones y retienen para sí los demás beneficios económicos que se derivan de la titularidad de las acciones de capital. Se ha señalado que el voto en fideicomiso se caracteriza por: (1) separar o desligar el derecho al voto de los otros beneficios que se derivan de la titularidad de las acciones de capital, (2) transferir irrevocablemente el derecho al voto sobre las acciones, por un período de tiempo; y por (3) otorgarse con el objetivo principal de obtener el control sobre una corporación. Carlos E. Díaz Olivo, *Corporaciones*, Publicaciones Puertorriqueñas, Hato Rey, P.R., 1999, pág. 214.

Por otro lado, la Ley General de Corporaciones, según enmendada, dispone, en lo pertinente, en su Artículo 7.08, 14 L.P.R.A. § 2908 como sigue:

*"(a) un accionista o cualquier número de ellos podrá, mediante acuerdo escrito, depositar acciones de capital de una emisión original con cualquier persona o personas o corporación o corporaciones o traspasar acciones de capital a las mismas para que actúen en calidad de fiduciarios, con el fin de otorgar a tal persona o personas, corporación o corporaciones que fueren designados fiduciario o fiduciarios del voto, el derecho al voto que corresponda a tales acciones por un plazo fijado en dicho acuerdo, según los términos y condiciones consignados en el acuerdo. Dicho acuerdo podrá contener cualesquiera otras disposiciones lícitas que no sean incompatibles con tal fin. [...]"*

Contrario al Artículo 706 de la Ley de Corporaciones de 1956 y a lo dispuesto por su equivalente en el Estado de Delaware, el Artículo 7.08 señala que el derecho al voto se otorgará al fiduciario por un plazo fijo según los términos y las condiciones consignadas en el acuerdo. De esta manera, el Artículo ofrece a los accionistas una flexibilidad total en la estructuración de estos arreglos de votación; y coloca a nuestra jurisdicción en la vanguardia de la legislación corporativa al permitir que los accionistas diseñen los acuerdos según sus necesidades, por el tiempo que estimen pertinente, sin la intervención innecesaria del Estado. Carlos Díaz Olivo, *supra,* a la pág. 215.

Así, por tratarse la médula de la controversia ante nuestra consideración, sobre la validez de los acuerdos contenidos en el contrato de fideicomiso de votos, nos remitiremos a las disposiciones generales sobre los contratos, contenidas en nuestro Código Civil. Veamos.

El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. Artículo 1206 del Código Civil de P.R., 31 L.P.R.A. § 3371. En virtud de ello, rige en Puerto Rico la norma de libertad de contratación, que promulga que las partes contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a la ley, a la moral, ni al orden público. Artículo 1207 del Código Civil de P.R., *supra,* § 3372; *Unisys v. Ramallo*

*Brothers*, 128 D.P.R. 842 (1991); *Sociedad de Gananciales v. Vélez & Asoc.,* 145 D.P.R. 508 (1998); *Trinidad v. Chade,* Op. de 18 de enero de 2001, **2001 J.T.S. 10**. Así pues, en el ámbito de las obligaciones y contratos, es doctrina fundamental que cuando los términos de un contrato son claros, y no dejan lugar a dudas sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación. Artículo 1233, § 3471, Código Civil, *supra*; *Marcial Burgos v. Tomé,* 144 D.P.R. 522 (1997); *Trinidad García v. Chade, supra.* En tales casos, prevalecerá entonces el sentido literal de las cláusulas. Es por ello que la facultad judicial extraordinaria de intervenir con la autonomía contractual mediante el ejercicio de su función moderadora debe ejercerse con extrema cautela y patente justificación. *Marcial Burgos v. Tomé, supra,* a la pág. 536, citando a *López de Victoria v. Rodríguez,* 113 D.P.R. 265, 271 (1982).

Existe un contrato cuando concurren los siguientes requisitos: (a) consentimiento de los contratantes; (b) objeto cierto que sea materia del contrato, y (c) causa de la obligación que se establezca. Artículo 1213, § 3391, Código Civil, *supra*. Constituyendo la causa de un contrato la razón esencial que impulsa al deudor a obligarse, *C.M. & Finance Corp. v. Cooley,* 103 D.P.R. 6 (1974); y pudiendo ser objeto de contrato todas las cosas que no están fuera del comercio de los hombres, aun las futuras. Artículo 1223 § 3421, Código Civil, *supra*.

Así pues, los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. Artículo 1210 § 3375, Código Civil, *supra*. Produciendo sus efectos sólo entre las partes que los otorgan y sus herederos; salvo en cuanto a éstos, el caso en que los derechos y obligaciones que proceden del contrato no sean transmisibles, o por su naturaleza, o por pacto, o por disposición de la ley. Si el contrato contuviere alguna estipulación a favor de un tercero, éste podrá exigir su cumplimiento, siempre que hubiese hecho saber su aceptación al obligado antes de que haya sido aquélla revocada. Art. 1209 § 3374, Código Civil *supra*.

No obstante, los contratos en que concurran el consentimiento, objeto y causa, pueden ser anulados; acción que prescribe a los cuatro años contados a partir del día en que cese la intimidación o violencia; o desde que se consume el contrato, en caso de error dolo o falsedad de causa; aunque no haya lesión para los contratantes, siempre que adolezcan de alguno de los vicios que los invalidan (error, dolo, violencia o intimidación). Art. 1252 § 3511, y 1253 § 3512; pudiendo ser ejercitada la acción de nulidad por los obligados principal o subsidiariamente en virtud de ellos. Art. 1254 § 3513.

En el caso de autos, Pinto Cruz basa la ilegalidad del Fideicomiso de Votos en que, al momento de constituirse, la corporación aún no había sido inscrita en el Departamento de Estado, lo que, a su juicio, invalida el contrato suscrito. No le asiste la razón. Veamos.

Según lo ya discutido, en P.R. rige la norma de libertad en la contratación, en virtud de la cual las partes pueden pactar según lo deseado, siempre que no sea en contravención a la ley, a la moral, ni al orden público. Igual amplitud rige en el campo de las corporaciones, al haberse concedido amplia libertad a los accionistas de una corporación para que establezcan los acuerdos que deseen relativos al derecho al voto, de conformidad con las necesidades de cada corporación.

En el caso de epígrafe, los colonos contratantes, voluntariamente comparecieron en escritura pública manifestando su deseo de ceder el derecho al voto de sus acciones ■ a los fideicomisarios, a cambio de sus servicios de administración. Según lo establece la ley, el contrato se suscribió por escrito y establecía fecha de vencimiento del acuerdo. Así pues, debemos concluir, en primer lugar, que el contrato de fideicomiso objeto de controversia era válido, pues contenía todos los elementos necesarios para su validez (consentimiento, objeto y causa), y no ser contrario a la ley, a la moral, ni al orden público.

En consecuencia, ello nos lleva a establecer que el contrato puede ser uno anulable y no nulo de su faz.

Acción para la cual, Pinto Cruz necesitaba tener *"standing"* y probar que el contrato adolecía de alguno de los siguientes vicios: error, dolo, violencia o intimidación.

Según lo estipulado por las partes, al momento de otorgarse la escritura que se impugna, Pinto Cruz no era colono, por lo cual, no compareció al otorgamiento de la misma. En consecuencia, carece de legitimación activa para impugnar su validez, toda vez que los contratos producen efecto entre las partes que los otorgan y sus herederos, salvo el caso de contrato a favor de tercero, situación que no se da en el caso de epígrafe. Por otro lado, sabido es que tratándose de la anulabilidad del contrato, el término prescriptivo para incoar tal acción, lo es el de cuatro (4) años, contados a partir del momento en que cesa la violencia o la intimidación, o desde que se consuma el contrato en caso de error, dolo o falsedad.

Nótese, además, que posterior ha haberse otorgado la escritura de fideicomiso de votos, y de haberse inscrito la corporación en el Departamento de Estado, Pinto Cruz pasó a formar parte de la corporación, para lo cual otorgó también una escritura de fideicomiso de votos. Si de alguna escritura podía éste haber solicitado la anulación, era precisamente de la escritura a la que él compareció, el 30 de enero de 1998.

En consecuencia, ninguno de los primeros cuatro errores fue cometido.

Pasemos pues, a considerar los últimos dos señalamientos.

Sabido es que la sentencia sumaria es un mecanismo procesal extraordinario y discrecional, que procede cuando la parte promovente le demuestra al tribunal que no existe necesidad de que se celebre una vista evidenciaria del caso en su fondo. *Medina v. M.S. & D. Química P.R., Inc.,* 135 D.P.R. 716, 726 (1994). Solamente debe ser dictada *"en casos claros, cuando el Tribunal tenga ante sí la verdad sobre todos los hechos pertinentes."* *Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell,* 117 D.P.R. 714, 720-721 (1986); *PFZ Properties, Inc. v. General Accident Insurance Co.,* 136 D.P.R. 881, 911-912 (1994).

Su propósito es *"propiciar la solución justa, rápida y económica de litigios que no presentan controversias genuinas de hechos materiales y que, por lo tanto, no ameritan la celebración de un juicio en su fondo."* *Pilot Life Ins. Co. v. Crespo Martínez,* 136 D.P.R. 624, 632 (1994); *Hernández Villanueva v. Hernández,* Op. de 27 de enero de 2000, **2000 J.T.S. 26,** a la pág. 608. Además, se ha señalado que el fin de la sentencia sumaria es aligerar la tramitación de un caso, permitiendo que se dicte sentencia sin celebrar una vista en los méritos, cuando de documentos no controvertidos surge que no existen controversias de hechos, sino que lo que resta es aplicar el derecho. *Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell, supra,* a la pág. 720; *Caquías v. Asoc. Res. Mansiones Río Piedras,* 134 D.P.R. 181, (1993); *PFZ Properties, Inc. v. General Accident Insurance Co., supra.*

La Regla 36.3 de la Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36.3, establece que se podrá dictar sentencia sumaria *"si las alegaciones,... deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiere, demostrasen que no hay controversia real sustancial en cuanto a ningún hecho natural y que como cuestión de derecho debe dictarse sentencia sumaria... Dicha sentencia podrá dictarse a favor o en contra de cualquier parte en el pleito."* *PFZ Properties, Inc. v. General Accident Insurance Co., supra,* a la pág. 911; *Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell, supra,* a las págs. 719-720.

Mediante dicho mecanismo procesal se pretende obtener un remedio rápido y eficaz en casos en que queda demostrado que no existe una controversia sobre hechos materiales del litigio. Véase: *Revlon Realistic, Inc. v. Las Américas Trust Company,* 135 D.P.R. 363, 376 (1994); *Rivera et. al. v. Superior Pkg., Inc. et. al.,* 132 D.P.R. 115, 133 (1992); *Tello, Rivera v. Eastern Airlines,* 119 D.P.R. 83, 86 (1987); *PFZ Properties, Inc. v. General Accident Insurance Co., supra,* a la pág. 912 (1994). Pero el objetivo de aligerar la tramitación de un caso no puede derrotar el principio fundamental de todo proceso ante un tribunal: obtener una solución justa. *Cuadrado Lugo v. Santiago Rodríguez,* 126 D.P.R. 272 (1990); *Presiding Bishop C.J.C. of L.D.S. v. Purcell, supra.* Así pues, [e]n

el sano ejercicio de su discreción, los tribunales no deben resolver sumariamente casos complejos o casos en los cuales están presentes cuestiones de interés público. (Citas Omitidas) *Rivera Rodríguez v. Departamento de Hacienda*, Op. de 17 de septiembre de 1999, **99 J.T.S. 144**, a la pág. 53.

Al dictar sentencia sumaria, el tribunal: (1) analizará los documentos que acompañan la moción solicitando la sentencia sumaria y los documentos incluidos con la moción en oposición y aquéllos que obran en el expediente del Tribunal...; (2) determinará si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *PFZ Properties, Inc. v. General Accident Insurance Co., supra*, a la pág. 913.

Un Tribunal no deberá dictar sentencia sumaria cuando: (1) existen hechos materiales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción, una controversia real sobre algún hecho material; o (4) como cuestión de derecho no procede, *PFZ Properties, Inc. v. General Accident Insurance Co., supra*, a las págs. 913-914; *Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell, supra*, pág. 722-723; *Cuadrado Lugo v. Santiago Rodríguez, supra*, a la pág. 280. Además, [h]ay litigios y controversias que por su naturaleza no deben resolverse por sentencia sumaria, porque difícilmente en tales casos el Tribunal puede reunir ante sí toda la verdad de los hechos a través de documentos. Así ocurre en controversias centradas en elementos subjetivos y en las que el factor de credibilidad juega un papel esencial, sino decisivo, para llegar a la verdad, y donde un litigante depende en gran parte de lo que extraiga del contrario en el curso de un juicio vivo. (Citas Omitidas) *Rivera Rodríguez v. Departamento de Hacienda*, Op. de 17 de septiembre de 1999, *supra*, a la pág. 53.

La Regla 36.4 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36.4, dispone, en lo pertinente, que cuando el tribunal de instancia estime necesario celebrar juicio, determinará, al examinar la moción de sentencia sumaria, los hechos materiales sobre los cuales no hay controversia sustancial y los hechos materiales que están realmente y de buena fe controvertidos. Lo importante de esta regla es que el texto hace énfasis en el carácter mandatorio de la determinación de los hechos materiales sobre los cuales no hay controversia sustancial y los hechos materiales que están realmente y de buena fe controvertidos. La Regla 36.4 exige, además, que el tribunal emita una orden *"especificando los hechos sobre los cuales no hay controversia sustancial"*. En tal caso, *"[a]l celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad."* Si el tribunal declara sin lugar la moción de sentencia sumaria y no cumple con la obligación de especificar los hechos establecidos, todas las cuestiones planteadas en las alegaciones deberán ventilarse en juicio plenario. *Hartmann v. American News Co.*, 171 F. 2d. 581 (1948). Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, **Publicaciones J.T.S., Inc**. 1979, págs. 192-193. Así pues, tomando en consideración que la sentencia sumaria es un remedio de carácter discrecional, *"[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de su día en corte, principio elemental del debido proceso de ley"*. *Roig Commercial Bank v. Rosario Cirino*, 126 D.P.R. 613, 617 (1990); *Management Administration Services Corp. v. E.L.A.*, Op. de 29 de noviembre de 2000, **2000 J.T.S. 189**, a la pág. 441.

Alega Pinto Cruz que no procedía dictarse sentencia sumariamente debido a que se le privó de la oportunidad de pasar prueba sobre sus contenciones. No obstante, no demostró sobre qué hechos existía controversia, de modo que procediera la celebración de una vista en su fondo. Cabe señalar, que a pesar de que Pinto Cruz presentó como parte de su evidencia, la escritura Número 16 de 19 de septiembre de 2001, ésta no tuvo el efecto de revocar o dejar sin efecto el Fideicomiso de Votos suscrito, toda vez que habiendo sido estipulado que las partes que comparecieron a la escritura de Fideicomiso de Votos siguen siendo los accionistas hoy día, quedó claramente demostrado que las personas que comparecieron al otorgamiento de la Escritura Número 16, no representaban el 90 porciento de los accionistas requerido para anular el Fideicomiso.

En consecuencia, habiendo sido desestimada la causa de acción de Pinto Cruz, procedía que se declarara Con Lugar la reconvención de los apelados, ya que iba dirigida a solicitar del Tribunal que una vez desestimada la

causa de acción de Pinto Cruz, ordenara a éste que se abstuviera de comparecer en representación de la corporación, lo que como consecuencia lógica implicaba, a su vez, que se declarara nula la elección de Pinto Cruz, y demás personas como oficiales de la referida corporación.

Finalmente, sólo nos resta discutir si erró el Tribunal al imponer honorarios de abogado. Veamos.

La Regla 44.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.1, dispone, con relación a las costas y los honorarios de abogado lo siguiente:

*"44.1 Las costas y honorarios de abogado*

*(a) Su concesión. Las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación, excepto en aquellos casos en que se dispusiera lo contrario por ley o por estas reglas. Las costas que podrá conceder el tribunal son los gastos incurridos necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que un litigante debe reembolsar a otro.*

*(b) . . .*

*(c) . . .*

*(d) Honorarios de abogado. En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta."*

El propósito de imponer honorarios de abogados por temeridad es establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito. *Rivera v. Tiendas Pitusa, Inc.,* Op. de 28 de junio de 1999, **99 J.T.S. 107**, a la pág. 1246. *Fernández v. San Juan Cement Co., Inc.,* 118 D.P.R. 713, 718 (1987). La condena al pago de honorarios de abogado e intereses por temeridad tiene como propósito el desalentar la litigación innecesaria, ayudando de esta manera a hacer viable y a garantizar una solución justa, rápida y económica del asunto ante la consideración del tribunal. *"[L]a 'temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia'."* *Elba A.B.M. v. U.P.R.,* 125 D.P.R. 294, 329 (1990). No procede con temeridad el que litiga una cuestión de derecho novel, no resuelta anteriormente en nuestra jurisdicción. *A.E.E. de P.R. v. Las Américas Trust Co.,* 123 D.P.R. 834 (1989); *M. Quilichini Sucrs., Inc. v. Villa Investment Corp.,* 112 D.P.R. 322 (1982); *Morales Garay v. Roldán Coss,* 110 D.P.R. 701 (1981); *Caloca v. C.I.A.A.,* 108 D.P.R. 164 (1978); *United Hotels of P.R. v. Willig,* 89 D.P.R. 188 (1963).

La imposición de honorarios de abogados es discrecional, pero la Regla 44.1 (d) de Procedimiento Civil es clara en el sentido de que cuando una parte ha procedido con temeridad, el tribunal deberá imponerle en su sentencia el pago de una suma por concepto de honorarios de abogado. Determinada la existencia de temeridad, la condena de honorarios es imperativa. (Citas Omitidas) *Blás Toledo v. Hospital Nuestra Señora de la Guadalupe,* 146 D.P.R. 267, 334 (1998). En ausencia de una conclusión expresa a tales efectos, un pronunciamiento en la sentencia condenando al pago de honorarios de abogado, implica que el tribunal sentenciador consideró temeraria a la parte así condenada. *Rivera v. Tienda Pitusa, supra,* a la pág. 1246.

En términos generales, se considera temeraria toda aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias. *Blás Toledo v. Hospital de Nuetra Señora de la Guadalupe, supra,* a las págs. 334-335; *Hawayek v. A.F.F.,* 123 D.P.

R. 526, 537 (1989); *Rivera v. Tiendas Pitusa, supra*; *Fernández v. San Juan Cement Co., Inc., supra*, 718-719 (1987).

Nuestro Tribunal, en el caso de *Fernández Mariño v. San Juan Cement Co, Inc.*, 118 D.P.R. 713, 719 (1987), enumeró algunas de las circunstancias que constituyen conducta temeraria: 1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; 2) defenderse injustificadamente de la acción; 3) creer que la cantidad reclamada es exagerada y siendo esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; 4) arriesgarse a litigar un caso del que se desprendía *prima facie* su negligencia; y 5) negar un hecho que le conste es cierto a quien hace la alegación. (Citas omitidas).

Al cuantificar los honorarios de abogados por temeridad, los tribunales pueden tomar factores tales como la naturaleza del litigio, las cuestiones de derecho envueltas en el mismo, la cuantía en controversia, el tiempo invertido, los esfuerzos y actividad profesional que hayan tenido que desplegarse y la habilidad y reputación de los abogados en el caso. Deberá mantenerse presente que el grado o intensidad de la conducta temeraria o frívola es el criterio o factor determinante y crítico que tienen que tomar en consideración dichos tribunales al determinar la cuantía de los honorarios de abogado a imponerse a la parte perdidosa que ha actuado con temeridad o frivolidad. (Citas Omitidas) *Blás Toledo v. Hospital Nuestra Señora de la Guadalupe, supra*, a la pág. 336.

Finalmente, como indicáramos anteriormente, la determinación de si una parte ha sido temeraria o no, recae en la discreción del Tribunal de Primera Instancia. Por lo que dicha determinación no será variada en apelación, a menos que se haya cometido un abuso de discreción o se haya impuesto una partida excesiva o exigua de honorarios de abogado. Véase, *Cotto Morales v. Calo Ríos*, 140 D.P.R. 604, 626 (1996); *CNA Casualty de P.R. v. Torres Díaz*, 141 D.P.R. 27, 44 (1996); *Bonilla Medina v. P.N.P.*, 140 D.P.R. 294, 305-306 (1996); *Elba A.B. M. v. U.P.R.*, 125 D.P.R. 294, 328-329; *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339, 349 (1989).

En este caso, a nuestro juicio, la determinación de temeridad hecha por el Tribunal, y la correspondiente imposición de $500 en concepto de honorarios de abogado, no es arbitraria o caprichosa, toda vez que se trata de la litigación de un pleito que pudo evitarse. En consecuencia, nos abstendremos de intervenir con la determinación realizada por el Tribunal a tales efectos.

En mérito a lo expuesto, confirmamos la **Sentencia** dictada el 9 de noviembre de 2001, por el Tribunal de Primera Instancia, Sala Superior de Humacao.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida I. Oquendo Graulau
Secretaria General

### ESCOLIOS 2002 DTA 101

**1.** (a) Que Pinto Cruz ni la Compañía Matriz de los Colonos, fueron parte del contrato de fideicomiso que se impugna; (b) el 31 de julio de 1997 se suscribió el Acuerdo de Accionistas y la escritura Número 15 sobre Fideicomiso de Voto; (c) el contenido de la escritura Número 2 del 30 de enero de 1998 sobre Fideicomiso de Voto; (d) que el 28 de octubre de 1997 se presentó ante el Departamento de Estado el Certificado de Incorporación; y (e) quienes firmaron el Fideicomiso de Voto son los mismos accionistas al día de hoy.

**2.** Acciones que aunque futuras, se encontraban en el mercado de los hombres, toda vez que las mismas constituían el activo que les fue transmitido a los colonos de la industria del azúcar, a raíz de la aprobación de la Ley Número 189 de 5 de septiembre de 1996, mejor conocida como la Ley de Transferencias de Activos y Pasivos para la Negociación de la Corporación Azucarera de Puerto Rico y/o la Autoridad de Tierras de Puerto Rico.