
Versión para imprimir

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Arkel Ramón Sánchez Torres, Lourdes López Torres y la Sociedad Legal de Gananciales Compuesta por ambos | |
| Recurridos | Certiorari |
| v. | 2012 TSPR 130 |
| Fundación Dr. Manuel de la Pila Iglesias; Dr. Luis G. Valentín Méndez, María T. Márquez Salazar y la Sociedad Legal de Gananciales Compuesta entre ambos | 186 DPR ____ |
| Peticionarios | |

Número del Caso: CC-2008-554

Fecha: 22 de agosto de 2012

Tribunal de Apelaciones:

Región Judicial de Ponce

Abogados de la Parte Peticionaria:

Lcdo. Juan Muñiz Belbrú
Lcda. María T. Alicea Pierantoni

Abogado de la Parte Recurrida:

Lcdo. Augusto Cirino Gerena

Materia: Ejecución de Sentencia – Venta en pública subasta de inmueble sin garantía hipotecaria; validez del precio de venta en subasta; doctrina de enriquecimiento injusto

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| ARKEL RAMÓN SÁNCHEZ TORRES, LOURDES LÓPEZ TORRES Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS<br><br>Recurridos<br><br>v.<br><br>FUNDACIÓN DR. MANUEL DE LA PILA IGLESIAS; DR. LUIS G. VALENTÍN MÉNDEZ, MARÍA T. MÁRQUEZ SALAZAR Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE AMBOS<br><br>Peticionarios | Núm.: CC-2008-0554 | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 22 de agosto de 2012.

Se nos presenta a través de este recurso la interrogante de si es menester fijar un precio mínimo para la venta de una propiedad inmueble en pública subasta producto de un trámite ordinario de cobro de dinero, sin que medie una garantía hipotecaria. Igualmente, atendemos los límites al derecho de un acreedor por sentencia de continuar sus gestiones de cobro, luego de advenir dueño de una propiedad del deudor a través del procedimiento de ejecución de sentencia cuando el valor de ésta excede lo pagado por el acreedor en la licitación.

## I

En noviembre de 2002 el Tribunal de Primera Instancia dictó Sentencia declarando *Ha Lugar* una Demanda por impericia médica instada por los recurridos, Arkel Ramón Sánchez Torres (señor Sánchez), su esposa, Lourdes López Torres (señora López), y la Sociedad Legal de Gananciales constituida entre ambos, contra los peticionarios, Luis G. Valentín Méndez, su esposa, María T. Márquez Salazar, y la Sociedad Legal de Gananciales compuesta por ambos. Conforme al referido dictamen, le fueron conferidos a la señora López una partida en daños ascendente a quinientos mil dólares ($500,000.00), así como ciento cincuenta mil dólares ($150,000.00) al señor Sánchez. Asimismo, se le concedieron a los recurridos ciento sesenta y dos mil quinientos dólares ($162,500.00) por concepto de honorarios de abogado, por entender el juzgador que la parte peticionaria había actuado con temeridad durante los procedimientos.

En desacuerdo, los peticionarios acudieron en alzada ante el Tribunal de Apelaciones.

Entre tanto, a solicitud de la parte recurrida, el tribunal de instancia emitió una Orden de anotación de embargo sobre la residencia principal de los peticionarios. Ello con el propósito de asegurar el cobro de la referida Sentencia en la eventualidad de que la misma fuera confirmada en alzada.

Mediante dictamen de 22 de junio de 2004, el foro apelativo intermedio confirmó la Sentencia apelada, pero redujo las cantidades otorgadas a los recurridos por el tribunal de instancia de la siguiente manera: doscientos cincuenta mil dólares ($250,000.00) para la señora López y setenta y cinco mil dólares ($75,000.00) para el señor Sánchez. De igual forma, eliminó la partida de honorarios de abogado.

Posteriormente, y a solicitud de la parte recurrida, el tribunal de instancia dictó una Orden de Ejecución de Sentencia. La subasta correspondiente a la residencia de los peticionarios se realizó el 2 de agosto de 2005. Dos (2) días más tarde, el Alguacil presentó ante el tribunal un Acta de Subasta donde hizo constar que se le adjudicó la buena pro a los recurridos, como únicos licitadores, luego de éstos ofrecer cincuenta mil dólares ($50,000.00) de la Sentencia a su favor. El 22 de agosto de 2005 dicha parte tomó posesión del inmueble.

Transcurridos dos (2) años desde la subasta, y luego de la venta de la propiedad en cuestión a unos terceros,[1] los recurridos acudieron al tribunal de instancia al amparo de la Regla 51.4 de Procedimiento Civil de 1979,[2] 32 L.P.R.A. Ap. III, R. 51.4 (2001), solicitando se le

---

[1]    Los recurridos revendieron la propiedad adquirida mediante subasta en **trescientos noventa y dos mil dólares ($392,000.00).**

[2]    Las ya derogadas Reglas de Procedimiento Civil de 1979 son las aplicables a los hechos presentes en este recurso.

ordenara a los peticionarios comparecer a una toma de deposición, con el propósito de identificar bienes adicionales de éstos para satisfacer el balance adeudado en virtud de la aludida Sentencia. Como fundamento para ello, alegaron haber cobrado únicamente los cincuenta mil dólares ($50,000.00) ofrecidos por ellos en la subasta.

Los peticionarios, por su parte, adujeron que la adjudicación del inmueble a favor de los recurridos tuvo el efecto de satisfacer la Sentencia en su totalidad. A tales efectos, sometieron una tasación de la propiedad reflejando un valor de cuatrocientos setenta y cinco mil dólares ($475,000.00) al 2 de septiembre de 2003.

El 6 de febrero de 2008 el foro de instancia emitió una Resolución disponiendo que la cuantía a ser aplicada a la deuda por sentencia fuera el valor del inmueble en el mercado a la fecha de la subasta, luego de deducidas las cargas hipotecarias que le afectaban. Es decir, su valor neto ("equity"). Estableció un plazo para que las partes se reunieran y acordaran cuál sería dicha cantidad o, de lo contrario, evidenciaran a cuánto ascendía el "equity" de la propiedad al 2 de agosto de 2005.

Insatisfecha, la parte recurrida acudió ante el Tribunal de Apelaciones mediante recurso de *certiorari*. Luego de expedir el auto solicitado, dicho foro revocó al tribunal primario y determinó que el valor del inmueble, para efectos de la deuda por sentencia, "es el valor por

el cual se adquirió el inmueble" en la subasta. Indicó, además, que ni el derecho sustantivo ni el procesal requieren que se le fije un precio mínimo a una propiedad a ser subastada en un procedimiento de venta judicial en ejecución de sentencia, por lo que la propiedad debía ser vendida, como en efecto lo fue, al mejor postor.

Es entonces que la parte peticionaria acude ante nos por medio del presente recurso señalando la comisión de los siguientes dos (2) errores:

> **Erró el Honorable Tribunal de Apelaciones al concluir que el derecho sustantivo y procesal en un trámite de ejecución de sentencia en un procedimiento ordinario por cobro de dinero, sin garantía hipotecaria, mediante la subasta de un inmueble, no se requiere un precio mínimo.**

> **Erró el Honorable Tribunal de Apelaciones al determinar que no se extinguió la cuantía dispuesta en la sentencia, provocando la subsistencia de una deuda artificial.**

Mediante Resolución le concedimos término a la parte recurrida para expresar su posición respecto al recurso presentado. Habiendo comparecido, resolvemos.

## II

Conforme los planteamientos esbozados, nos toca resolver primeramente si, al igual que en las ventas judiciales en virtud de ejecución de hipoteca, se requiere la fijación de un precio que sirva de tipo mínimo para la subasta de un inmueble en un procedimiento de ejecución de sentencia.

Los peticionarios nos invitan a extender el requisito de justiprecio al proceso de ejecución de sentencia no vinculado a garantías hipotecarias. Apuntan a las graves injusticias que se suscitan al venderse propiedades sin que medie un precio mínimo lo cual permite que el deudor sea desprovisto de su propiedad por cantidades que no guardan relación con el valor real del inmueble. Aunque concordamos con la problemática que trae a relucir la parte peticionaria en este recurso, no existe base en derecho para implementar lo que nos pide.

La ejecución de hipoteca por la vía ordinaria se rige por las disposiciones de las Reglas de Procedimiento Civil, Regla 51.3 *et seq.*, 32 L.P.R.A. Ap. III (2001), así como aquellos preceptos de la Ley Hipotecaria y del Registro de la Propiedad de 1979 (Ley Hipotecaria) que le son aplicables por decreto expreso del legislador.[3] BL Investment v. Registrador, 173 D.P.R. 833 (2008); Rodríguez Morales v. Registrador, 142 D.P.R. 347 (1997); Arroyo v. Ortiz y Franco, 133 D.P.R. 62 (1993).

La norma atinente al tipo mínimo como requisito a una subasta válida, según reconocida inicialmente en Ponce Federal Savings v. Gómez, 108 D.P.R. 585 (1979), y reiterada posteriormente en Coop. Ahorro y Créd. v. Registrador, 142 D.P.R. 369 (1997); Rodríguez Morales v.

---

[3] Las disposiciones aplicables al proceso aparecen detalladas en el Artículo 201 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2701 (2009).

Registrador, *supra*; Arroyo v. Ortiz y Franco, *supra*; Junta
Retiro Maestros v. Registrador, 109 D.P.R. 563 (1980),
está predicada exclusivamente en principios de derecho
hipotecario.  Es en Ponce Federal Savings v. Gómez, *supra*,
donde, luego de trazar el historial legislativo atinente a
los requisitos constitutivos de la hipoteca, conjuntamente
con los procesos relativos a su ejecución, expresamente
reconocimos que al igual que en el procedimiento ejecutivo
sumario el precio de tasación pactado por las partes en la
escritura de constitución de hipoteca configura el precio
mínimo para el remate en un procedimiento ordinario.

En la actualidad, esta normativa se encuentra
plasmada en el Artículo 179 de la Ley Hipotecaria, 30
L.P.R.A. sec. 2575 (2005).  Dicha disposición estatutaria
consigna explícitamente el precio de tasación como
requisito ineludible para la validez de la escritura de
hipoteca.  Se precisa también que el mismo servirá de tipo
mínimo en la primera subasta tanto en el procedimiento de
ejecución sumario como en el ordinario.[4]

---

[4]     El Artículo 179 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2575 (2005),
establece lo siguiente:

> Para que pueda tramitarse la ejecución y cobro de un
> crédito hipotecario, con arreglo al procedimiento sumario o bien
> con arreglo al procedimiento ordinario, será indispensable que en
> la escritura de constitución de la hipoteca se determine el
> precio en que los interesados tasen la finca o derecho real
> hipotecado, para que sirva de tipo en la primera subasta que se
> deba celebrar.

> Para la segunda y tercera subasta regirán los tipos
> señalados en la sec. 2721 de este título.

Igualmente dispone el Artículo 221 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2721 (2005),[5] a los efectos de que la tasación acordada en la escritura de constitución de hipoteca servirá de tipo mínimo para la primera subasta. En la eventualidad de que esa primera subasta se declare desierta, el tipo mínimo para la segunda será dos terceras (2/3) partes del precio pactado y, de aun no comparecer un licitador, se utilizará la mitad del precio pactado como precio mínimo para la tercera subasta. Íd.

Análogo al planteamiento que nos presenta la parte peticionaria en su recurso, los abusos causados por la falta de justiprecio en las ejecuciones de hipoteca ocasionó que se adjudicaran mediante este trámite propiedades por cantidades irrisorias. Esa práctica operaba en detrimento de los deudores puesto que, no solamente perdían sus propiedades en el remate, sino que las deudas correspondientes continuaban en vigor aun luego de concluido el proceso de venta.

---

[5] El mismo dispone, en lo pertinente, lo siguiente:

Servirá de tipo para la subasta en este procedimiento el precio en que hayan tasado la finca los contratantes en la escritura de constitución de hipoteca y no se admitirá oferta alguna inferior a dicho tipo. Si no produjere remate ni adjudicación la primera subasta, en la segunda que se celebrare servirá de tipo las dos terceras 2/3 partes del precio pactado. Si tampoco hubiere remate ni adjudicación en la segunda subasta, regirá como tipo de la tercera subasta la mitad del precio pactado….

La siguiente expresión resume la situación que se pretendió atender mediante la implementación del precio mínimo:

> Nótese que el propósito perseguido al requerir el establecimiento de dicho tipo mínimo fue precisamente el de cerrar la puerta a la grave injusticia que representa la adquisición por el acreedor de la finca hipotecada mediante oferta en subasta de parte del crédito adeudado, adjudicándose el inmueble por precio irrisorio y libre para perseguir otros bienes de su deudor por el balance impagado de su crédito.

Coop. Ahorro y Créd. v. Registrador, *supra*, pág. 379 (comillas y cita suprimidas); Arroyo v. Ortiz y Franco, *supra*; Junta Retiro Maestros v. Registrador, *supra*; Ponce Federal Savings v. Gómez, *supra*.

A pesar de los inconvenientes que surgen por la falta de justiprecio, según aludidos por la parte peticionaria, nos vemos impedidos de atender la problemática atinente a ventas judiciales que no responden a créditos hipotecarios con respuestas fundamentadas estrictamente en un mandato legislativo en el ámbito hipotecario. Contrario a los hechos presentes en los casos antes citados, en este recurso no media una hipoteca. Más bien, la acción versa sobre la ejecución de una propiedad de los peticionarios con el propósito de satisfacer las sumas conferidas a los recurridos por sus daños personales. Entendemos, por lo tanto, que los rigores de la Ley Hipotecaria, en específico el requisito de tipo mínimo para subasta, le resultan inaplicables.

Sin embargo, según explicamos más adelante, no por ello quedan totalmente desprovistos de protección los deudores quienes, en virtud de una sentencia decretada en su contra, ven sus bienes rematados para satisfacer las obligaciones allí consignadas.

A base de lo anterior, resolvemos que no incidió el Tribunal de Apelaciones en lo atinente al primer señalamiento de error.

## III

### A. Validez del precio de venta en subasta

Procedemos entonces a discutir las pautas que rigen los procedimientos de ejecución de sentencia como el que hoy nos ocupa. Acorde advertimos anteriormente, resulta claro que las normas que operan en el ámbito del derecho hipotecario no aplican a los hechos de este caso, específicamente lo atinente al precio mínimo, puesto que no les concierne garantía hipotecaria alguna.

Es la Regla 51.8 de Procedimiento Civil de 1979, 32 L.P.R.A. Ap. III, R. 51.8 (Supl. 2009), la que atiende lo relativo a las ventas judiciales. Ésta provee, en lo pertinente, lo siguiente:

> (b) *Manera de hacer la venta.* - La venta judicial de bienes en cumplimiento de una orden de ejecución, **deberá hacerse por subasta al mejor postor**…. Una vez que se hubieren vendido bienes suficientes para cumplir la orden de ejecución, no podrán venderse bienes adicionales….
>
> (c) ….

(d) *Acta de subasta y entrega de* bienes. -
Verificada la venta, el oficial a cargo de la
misma levantará un acta por escrito
describiendo lo acontecido durante la subasta
y **la adjudicación de venta al mejor postor
quien pagará el importe de la venta en dinero
efectivo o cheque certificado** a la orden del
oficial en cuestión. En casos
extraordinarios, el tribunal podrá ordenar
cualquier otra forma de pago…. En caso de
venta de propiedad inmueble, el oficial
encargado de la venta otorgará escritura
pública a favor del comprador ante el notario
que este último seleccione, abonando éste el
importe de tal escritura.

(Énfasis nuestro).

Según se desprende de su propio texto, en lo que
respecta al precio de venta, sólo se dispone para que la
propiedad a ser subastada se le adjudique al mejor postor.
No se requiere la fijación de un precio que sirva de tipo
mínimo para la subasta ni se establece un mecanismo para
calcular su valor. No obstante, ello no significa que un
licitador puede ofrecer cualquier suma por irrisoria que
parezca. Si la transferencia se realiza a cambio de una
cantidad sumamente baja, la venta podría resultar nula. A
esos efectos, hemos dictaminado que "para que una venta en
ejecución de sentencia sea nula, el precio pagado en ella
debe ser tan exageradamente inadecuado que cree una
presunción de fraude". Ramery Vélez v. Banco Popular, 90
D.P.R. 274, 280 (1964). Véanse además, Figueroa v. Banco
de San Juan, 108 D.P.R. 680, 692 (1979); García v. Humacao
Fruit Co., 25 D.P.R. 682, 689 (1917). Se establecen de
este modo unos límites al precio que el encargado de

conducir la subasta, de ordinario el alguacil del tribunal, puede aceptar de un licitador para adjudicársele el bien subastado.

Conforme la naturaleza particular del procedimiento de ejecución de sentencia existen, además del monto licitado, otros factores que inciden en la determinación de si resulta o no adecuado el precio pagado. Sobre este particular hemos reconocido que el valor de una propiedad obligatoriamente se afecta al disponerse de ella a través del mecanismo forzado de pública subasta. Según indicado:

> Si tomamos en cuenta que no se trata de una venta voluntaria, sino forzada, en la que el precio razonable debe determinarse, no en relación con el valor del inmueble en el mercado, sino con respecto a lo que se puede obtener en una subasta pública, es forzoso concluir que no se ha establecido controversia alguna de fraude por precio inadecuado.

Figueroa v. Banco de San Juan, *supra*, pág. 692.

Relacionado a lo anterior, cabe señalar que, excepto aquellos casos extraordinarios en que así lo disponga el tribunal, la Regla 51.8(d) de Procedimiento Civil, *supra*, exige que el licitador agraciado entregue el importe total de su oferta "en el acto mismo de la adjudicación en moneda de curso legal o cheque de gerente o letra bancaria con similar garantía". Banco Gub. de Fomento v. Abarca Warehouses, 109 D.P.R. 132, 135 (1979). Este requisito forzosamente afecta la disponibilidad de licitadores conforme aumenta el precio de la propiedad. Ello obedece a que es preciso contar con un cierto grado de solvencia

económica para disponer de altas sumas de dinero en efectivo o su equivalente al momento de participar en la subasta.

Igualmente, como parte del proceso, es menester contabilizar las cargas que afectan la propiedad a ejecutarse. Así, por ejemplo, las contribuciones y las hipotecas por las cuales viene obligado a responder el adquirente son factores relevantes al calcular la razonabilidad del costo del inmueble. Figueroa v. Banco de San Juan, *supra*; Salas v. Cabassa, 69 D.P.R. 457 (1948).

Al examinar la situación particular de autos advertimos que, a pesar de que la parte recurrida abonó únicamente cincuenta mil dólares ($50,000.00) de la sentencia a su favor en la subasta, no por ello podemos inferir que dicha cantidad resulta exageradamente inadecuada.[6] Debe tomarse en cuenta que los recurridos se vieron forzados a asumir dos (2) hipotecas que afectaban el inmueble ascendentes a doscientos cuarenta y cinco mil dólares ($245,000.00).[7]

---

[6] Aunque la tasación del año 2003, es decir, dos (2) años previos a la subasta, valoró la residencia en cuatrocientos setenta y cinco mil dólares ($475,000.00), los recurridos la vendieron posteriormente a un tercero en trescientos noventa y dos mil dólares ($392,000.00).

[7] Las partes no especificaron para récord el balance de dichos gravámenes al momento de la ejecución. Únicamente informaron al tribunal de instancia que la primera hipoteca era de ciento cincuenta mil dólares ($150,000.00) y la segunda de noventa y cinco mil dólares ($95,000.00). Por lo tanto, para efectos de esta Opinión, tomamos estas cantidades como ciertas.

**B. Enriquecimiento injusto**

No obstante, entendemos que, en casos como el presente en los que se le adjudica una propiedad **a un acreedor por sentencia**, permitirle a éste descontar de su acreencia únicamente la cantidad que abonó para adquirir dicho inmueble mediante subasta, independientemente de su valor, podría conllevar el enriquecimiento injusto del acreedor a costa del deudor.

La utilización de la doctrina de enriquecimiento injusto no se encuentra restringida a la esfera contractual. "Es ésta una doctrina o principio general de derecho que puede aplicarse a situaciones muy distintas entre sí, siempre y cuando tengan en común un elemento: el que de no aplicarse se perpetraría la inequidad de que alguien se enriqueciese injustamente en perjuicio de otro." Silva v. Comisión Industrial, 91 D.P.R. 891, 897-898 (1965). Constituye una norma cimentada en criterios de equidad, es decir, justicia que permea a todo nuestro ordenamiento jurídico. Mun. Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003, 1019 (2011).

"Recurrimos a esta figura cuando la ley no ha previsto una situación en la que se produce un desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento vigente." Mun. Quebradillas v. Corp. Salud Lares, *supra*, pág. 1019 (comillas y citas omitidas); Ortiz Andújar v. E.L.A., 122

D.P.R. 817 (1988). Con el propósito de viabilizar su utilización, hemos adoptado los siguientes criterios:

1. Existencia de un enriquecimiento.
2. Un empobrecimiento correlativo.
3. Una conexión entre el empobrecimiento y el enriquecimiento.
4. Falta de causa que justifique el enriquecimiento.
5. Inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa.

Mun. Quebradillas v. Corp. Salud Lares, *supra*, págs. 1019-1020; Ortiz Andújar v. E.L.A., *supra*, pág. 823.

Una vez examinados los hechos presentes en este recurso, concluimos que se cumplen todos los factores pertinentes para la aplicación de la mencionada pauta doctrinal. Primeramente, al adjudicársele la propiedad a la parte recurrida por cincuenta mil dólares ($50,000.00), ésta obtuvo un aumento en su patrimonio. Luego, en el momento en que la propiedad se desplazó del patrimonio de la parte peticionaria se produjo su correlativo empobrecimiento. Existe, a su vez, la requerida conexión entre el desprendimiento del uno y el aprovechamiento del otro. Así pues, se observan los próximos dos (2) requisitos.

La cuarta condición también se satisfizo. Según establecimos en Ortiz Andújar v. E.L.A., *supra*, el "término 'causa' no tiene aquí la acepción que se le da en materia contractual, sino que toma en el significado de

acto jurídico que explica, que justifica la adquisición de un valor". Íd. pág. 829.

En otras palabras, el beneficio o incremento en el patrimonio debe estar asentado en algún principio de derecho válido. Según hemos señalado:

> Desde prismas diversos, el concepto de causa del enriquecimiento ha sido objeto de serios debates entre juristas. No obstante, la doctrina mayoritaria en este momento se inclina a reconocer situaciones en las que no se puede aplicar la acción de enriquecimiento injusto debido a que la atribución patrimonial posee una causa válida. Entre las mismas se señalan: cuando existe un convenio legal o un testamento y cuando se ejercita un derecho sin abuso.

Ortiz Andújar v. E.L.A., *supra*, págs. 829-830 (nota al calce y citas omitidas).

En este caso, los recurridos obtuvieron la ventaja económica que representa el verdadero valor o "equity" de la propiedad adquirida. Bajo las circunstancias en que se concretó la adquisición, no podemos concluir que existía causa alguna que validara la ganancia correspondiente al "equity" del inmueble en detrimento de los peticionarios. Por consiguiente, se cumple la cuarta condición.

En lo que respecta el quinto y último requisito, no vemos nada en la Regla 51.8 de Procedimiento Civil, *supra*, que excluya la aplicación de la doctrina de enriquecimiento sin causa a la ejecución de una propiedad para el cobro de una deuda. De esta forma, concluimos que

están presentes en este caso los elementos del enriquecimiento injusto.

Los recurridos obtuvieron la propiedad ejecutada por cincuenta mil dólares ($50,000.00), una cantidad muy inferior al valor de tasación, y la vendieron en menos de dos (2) años por trescientos noventa y dos mil dólares ($392,000.00). Negarnos a utilizar el precepto doctrinal que repudia el enriquecimiento injusto en casos como el presente, facultaría a los acreedores a continuar cobrando del deudor aun luego de haber obtenido bienes a través del procedimiento de ejecución cuyo valor excede la deuda por sentencia. Ello equivale a condonar el que se perpetúe una deuda independientemente del lucro obtenido por el acreedor. No vemos fundamento que obligue a este resultado en especial cuando, al así hacerlo, se trastocan nociones básicas de justicia.

De otra parte, el permitir que se abone el valor real de la propiedad al crédito por sentencia no perjudica al acreedor en sus derechos pues, a través del inmueble, tiene a su haber el equivalente del dinero adeudado y su capital se ve acrecentado correlativamente.

Contrario a la posición asumida por la disidencia, no vemos razón de peso para excluir a un deudor de las mercedes de una doctrina en equidad como lo es el enriquecimiento injusto. El cobro de una deuda no debe ser base para que una de las partes saque provecho de la

otra. Realmente, lo que se pretende es que el acreedor cobre su acreencia y lo que en justicia le corresponde; no que se enriquezca a cuenta del deudor, ejecutándole propiedades consecutivamente y escogiendo cuánto amortizar de su crédito por cada una sin contabilizar el efecto de su valor neto en la deuda.

No podemos pasar por alto que en este caso en particular, asumiendo que las cargas hipotecarias ascendían a doscientos cuarenta y cinco mil dólares ($245,000.00), a través de un crédito de su sentencia por la cantidad de cincuenta mil dólares ($50,000.00), los recurridos se hicieron de una propiedad cuyo valor oscilaba entre cuatrocientos setenta y cinco mil dólares ($475,000.00), según tasación efectuada dos (2) años antes de la subasta, y trescientos noventa y dos mil dólares ($392,000.00), que fue el precio de venta de dicha propiedad a un tercero posterior a la ejecución mediante subasta.

Habida cuenta de que la residencia de los peticionarios contaba con un valor residual al momento en que pasó a ser parte del patrimonio de los recurridos, como cuestión de equidad, corresponde restarle ese valor al balance adeudado por sentencia. En este particular, fue acertada la apreciación del tribunal primario al ordenarle a las partes evidenciar el "equity" de la

propiedad ejecutada para luego llevar a cabo los cómputos correspondientes.

Acorde con lo anterior, como primer paso a determinar el valor neto del inmueble en este caso, es menester deducir el monto de las cargas hipotecarias del precio de la propiedad para la fecha de la subasta. De otra parte, debe tomarse en consideración también que la deuda quedó a su vez reducida en los cincuenta mil dólares ($50,000.00) que los recurridos ofrecieron en la subasta.[8]

Al no contar con los elementos de juicio sobre estos particulares, es función del tribunal de instancia allegar toda la prueba necesaria para hacer la evaluación de los factores relevantes y determinar el crédito que corresponda.

Advertimos que nada de lo aquí dispuesto afecta los casos en que **un tercero**, ajeno a la deuda que se procura cobrar, es quien resulta ser el licitador agraciado en la subasta puesto que, bajo esta premisa, el acreedor por sentencia únicamente recibirá la cantidad pagada por la propiedad ejecutada.

Así pues, no vemos razón alguna para que nuestra decisión cree incertidumbre entre los licitadores, según intima la opinión disidente, puesto que en nada se afectan

---

[8]    Nos vemos imposibilitados de realizar los cálculos pertinentes para determinar el balance exacto de la deuda por sentencia una vez se ejecutó el inmueble. No constan en autos ni el valor de la propiedad para ese entonces, ni las cantidades específicas adeudadas en virtud de las hipotecas que gravaban la misma, ambos componentes esenciales para la correspondiente ecuación matemática.

los derechos de esos terceros por lo dictaminado en el día de hoy. En esta ocasión se atiende exclusivamente la relación **entre acreedor y deudor por sentencia.**

Aclaramos igualmente que en cuanto a la norma pautada en el día de hoy nada tiene que ver el que la propiedad adjudicada al acreedor por sentencia aumente o disminuya de valor posterior a la fecha de la subasta. Según explicamos anteriormente, lo determinante para efectos de fijar el monto del crédito a abonarse a la deuda existente, es el valor residual de la propiedad **al momento en que ésta pasa a ser parte del patrimonio del acreedor.** Cualquier cambio en valor posterior a la subasta es impertinente a esta ecuación y corre por suerte del acreedor agraciado en la subasta.

Hemos reconocido que, dadas las limitaciones al método de pago y las circunstancias en que se produce la venta, el precio en el trámite de una subasta no puede equipararse con el precio de una compraventa en el mercado libre donde hay disponible un financiamiento a aquellos compradores interesados. Figueroa v. Banco de San Juan, *supra*. Partiendo de esa premisa, surge la posibilidad real de que en ejecuciones a favor de un acreedor por sentencia la propiedad cuente con un valor neto que exceda el precio de subasta. En estos casos, como bien dictaminó el foro de instancia en su Resolución objeto de la Sentencia del Tribunal de Apelaciones aquí recurrida, a

menos que las partes lo estipulen, corresponde al deudor que esté en desacuerdo con lo ofrecido por el acreedor por sentencia en la subasta, probarle al tribunal, en un trámite posterior, el valor en el mercado de la propiedad **a la fecha de la subasta**. Este trámite se limita únicamente a establecer el **monto a acreditarse a la deuda** en aquellas situaciones en que surja disputa al respecto. No concierne este proceso a las funciones del alguacil ni vulnera el curso normal de subasta.

Advertimos igualmente que nuestra decisión en nada afecta las disposiciones de la nueva Ley de Protección del Hogar, Ley Núm. 195-2011, 31 L.P.R.A. sec. 1858 *et seq.* (Supl. 2012) (Ley Núm. 195-2011), que protegen de embargo y ejecución aquellas propiedades que cualifiquen como hogar seguro conforme dispone la ley citada por la opinión disidente.[9]

Primeramente, este nuevo esquema legal no aplica a los hechos de este caso porque éstos preceden a su aprobación.[10] De otra parte, la aludida legislación tampoco dispone de la problemática hoy presentada para nuestra consideración. Resulta claro que su protección no se extiende a otras propiedades del deudor que no constituyan su "residencia principal". Quiere esto decir

---

[9]     Según la ley mencionada, excepto en las situaciones allí expresamente consignadas, le está vedado a cualquier acreedor satisfacer su deuda mediante la venta de una propiedad acreditada bajo dicho estatuto.

[10]     Conforme dispuesto en su Artículo 17, la Ley Núm. 195-2011, 31 L.P.R.A. sec. 1858 *et seq.*, comenzó a regir inmediatamente después de su aprobación, es decir, el 13 de septiembre de 2011 y su aplicación es prospectiva.

que, bajo el escenario propuesto por la disidencia, cualquier otro bien del deudor por sentencia como podría serlo, por ejemplo, una segunda propiedad, un predio de terreno sin una "estructura enclavada en el mismo" (véase 31 L.P.R.A. sec. 1858 (Supl. 2012)), o cualquier otro inmueble que no cualifique bajo la Ley de Protección del Hogar como "residencia principal", íd., quedaría expuesto a ejecución por su acreedor meramente por la cantidad licitada sin ninguna oportunidad de reajuste en la acreencia por el monto de su valor neto.

Entendemos que los principios básicos de justicia, y la ausencia de legislación pertinente que la atienda, exigen nuestra intervención en una situación como ésta que resulta en el enriquecimiento injusto de una parte sobre la otra. De ninguna manera se le niega a un acreedor lo que por derecho le corresponde. No obstante, nos toca velar por los derechos de todos, incluyendo la parte deudora en esta instancia.

**IV**

Por todo lo antes expuesto, se expide el auto de *certiorari* solicitado, se revoca la Sentencia emitida por el Tribunal de Apelaciones el 13 de mayo de 2008 y se reinstala en su lugar el dictamen del Tribunal de Primera Instancia con fecha de 6 de febrero de 2008.

Se dictará Sentencia de conformidad.

ROBERTO FELIBERTI CINTRÓN
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| ARKEL RAMÓN SÁNCHEZ TORRES, LOURDES LÓPEZ TORRES Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS<br><br>Recurridos<br><br>v.<br><br>FUNDACIÓN DR. MANUEL DE LA PILA IGLESIAS; DR. LUIS G. VALENTÍN MÉNDEZ, MARÍA T. MÁRQUEZ SALAZAR Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA ENTRE AMBOS<br><br>Peticionarios | Núm.: <u>CC-2008-0554</u> | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 22 de agosto de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se expide el auto de *certiorari* solicitado, se revoca la Sentencia emitida por el Tribunal de Apelaciones el 13 de mayo de 2008 y se reinstala en su lugar el dictamen del Tribunal de Primera Instancia con fecha de 6 de febrero de 2008.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton disiente con opinión escrita, a la cual se une la Juez Asociada señora Rodríguez Rodríguez, el Juez Asociado señor Martínez Torres y el Juez Asociado señor Estrella Martínez.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Arkel Ramón Sánchez Torres;
Lourdes López Torres, et als.

    Recurridos

        v.                         CC-2008-0554
*Certiorari*

Fundación Dr. Manuel de la Pila
Iglesias; Dr. Luis G. Valentín
Méndez; María T. Márquez Salazar,
et als.

    Peticionarios

Opinión Disidente emitida por el Juez Presidente señor HERNÁNDEZ DENTON a la cual se unen la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ y los Jueces Asociados señores MARTÍNEZ TORRES y ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 22 de agosto de 2012.

Disentimos de la Opinión que hoy emite una mayoría de este Tribunal por entender que la figura del enriquecimiento injusto es inaplicable a este caso. Además, entendemos que el foro judicial no debe asumir la responsabilidad de valorar bienes embargados; práctica que hasta hoy era realizada por los licitadores que acuden a las subastas. Somos del criterio de que, en el contexto de la ejecución por sentencia, el valor de los bienes subastados debe continuar siendo el que establecen los licitadores.

I.

En este caso, el Tribunal de Primera Instancia dictó sentencia declarando con lugar una demanda de daños y perjuicios por impericia médica instada

por los recurridos, el Sr. Arkel Sánchez Torres, su esposa, la Sra. Lourdes López Torres y la Sociedad Legal de Gananciales compuesta por ambos (matrimonio demandante). Los foros inferiores entendieron probado que la señora López Torres sufrió una serie de daños físicos considerables, por lo que declararon responsables a los codemandados peticionarios, el Dr. Luis G. Valentín Méndez, su esposa y la Sociedad Legal de Gananciales compuesta por ambos (médico demandado). Como resultado del litigio, se concedió una suma que, tras ser reducida por el Tribunal de Apelaciones, totalizó una cuantía global de $325,000. La sentencia que impuso esa cuantía advino final y firme.

El matrimonio demandante obtuvo una anotación preventiva en aseguramiento de sentencia sobre la residencia ganancial del médico demandado y, posteriormente, el foro primario dictó una orden de ejecución de sentencia. Se celebró la subasta correspondiente, se declaró vacante, y se le adjudicó la propiedad al matrimonio demandante, el cual ofreció un abono de sentencia por un valor de $50,000. Transcurridos dos años de la reventa de la propiedad a unos terceros, por el precio de $392,000, el matrimonio demandante acudió nuevamente al foro de primera instancia y solicitó que se le ordenara al médico

demandado a satisfacer el balance adeudado en virtud de la sentencia por daños, a saber: $325,000 menos los $50,000 representados por el valor de la propiedad adjudicada en la subasta.

El médico demandado respondió que la adjudicación de la residencia al matrimonio demandante tuvo el efecto de satisfacer la sentencia en su totalidad. En apoyo de ese argumento, presentó una tasación de la casa, realizada durante la pendencia del litigio entre ambos, en la cual el inmueble obtuvo un valor de $475,000. El Tribunal de Primera Instancia resolvió que la cuantía a ser aplicada a la deuda debía ser el valor del inmueble en el mercado a la fecha de la subasta, luego de deducidas las cargas hipotecarias que le afectaban. Es decir, su valor neto o "equity". La propiedad tenía dos gravámenes hipotecarios que debieron ser cubiertos por el adquirente, por lo que el foro de primera instancia concedió un plazo para que las partes acordaran el valor neto de la propiedad al momento de la celebración de la subasta.

Insatisfecho, el matrimonio demandante acudió ante el Tribunal de Apelaciones. El foro apelativo intermedio revocó al foro primario y resolvió que el valor del inmueble para efectos de la deuda por sentencia es el valor por el cual se adquirió el inmueble en la subasta. Dicho de otra forma, resolvió

que para propósitos de satisfacer una sentencia, el único valor que se le puede adjudicar a un bien subastado en ejecución es el valor que se ofrece en la subasta; en este caso, $50,000. Inconforme, el médico demandado acudió ante nos.

En síntesis, el argumento de los peticionarios es que el Art. 220 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2720, exige que las ventas de bienes inmuebles en procedimientos de subasta estén sujetos a un precio mínimo. Como en este caso no se celebró la subasta a partir de ese precio mínimo, conocido en el derecho hipotecario como "tipo mínimo", aducen que el valor real que recibieron los demandantes a quienes se les adjudicó la residencia es mucho mayor al abono concedido a la sentencia y que ello conlleva que se dé por extinguida.

Así las cosas, le concedimos un término al matrimonio demandante para que se expresara.

II.

Atendido el recurso, nos correspondía determinar si la adjudicación de un inmueble a favor de un acreedor por sentencia, tras declararse vacante una subasta, conlleva que solo se aplique el valor de remate a la acreencia, o si, por el contrario, se debe imputar el valor en el mercado del bien objeto de subasta al momento de celebrarse esta u otro valor

mínimo análogo bajo la Ley Hipotecaria, 30 L.P.R.A. secs. 2000 *et seq.*

Como bien señala la Opinión mayoritaria, en el ámbito hipotecario las propiedades ejecutadas se subastan a partir de un tipo o precio mínimo, pactado por los contratantes al otorgarse la hipoteca. Art. 179 de la Ley Hipotecaria, 30 L.P.R.A sec. 2575. Véase, además, <u>Rodríguez Morales v. Registrador</u>, 142 D.P.R. 329 (1997). De esa manera, en beneficio tanto del acreedor como el deudor, se evita que las propiedades sean subastadas por un precio excesivamente bajo que no refleje su valor en el mercado. <u>Coop. Ahorro y Créd. v. Registrador</u>, 142 D.P.R. 369 (1997). Ese tipo mínimo también se imputa cuando, tras declararse vacante la tercera subasta, la propiedad inmueble se le adjudica al acreedor. Íd.; 30 L.P.R.A sec. 2575. No obstante, en el ámbito de las subastas en ejecución de sentencia que no tienen que ver con deudas hipotecarias esa protección del tipo mínimo no existe. Ello conlleva que, en algunas ocasiones, las propiedades, tanto inmuebles como muebles, sean adjudicadas a precios excesivamente bajos, también conocidos como valor de remate.

Por ello, una mayoría resuelve correctamente que no puede admitirse un tipo mínimo como parte del proceso de subastas que no tienen que ver con una ejecución

hipotecaria porque **"no existe base en derecho para implementar[lo]"**. En ese sentido, lo correcto era confirmar la determinación del Tribunal de Apelaciones.

La celebración de subastas para la ejecución de sentencias que no tienen que ver con el derecho hipotecario, se atiende conforme a las Reglas de Procedimiento Civil. En esencia, la Regla 51.8 de Procedimiento Civil de 1979,[11] 32 L.P.R.A. AP. III R. 51.8, establece que la propiedad simplemente se le adjudicará "al mejor postor". Por ello, como bien establece la ponencia mayoritaria, no se requiere la fijación de un precio mínimo para la venta de esos bienes. **Nuestro ordenamiento tampoco reconoce un mecanismo para calcular el valor de los bienes a subastarse.** A esos efectos, se ha resuelto que "para que una venta en ejecución de sentencia sea nula, el precio pagado en ella debe ser tan exageradamente inadecuado que cree una presunción de fraude". Ramery Vélez v. Banco Popular, 90 D.P.R. 274, 280 (1964).

Además, hemos reconocido que el valor de una propiedad necesariamente se afecta cuando se tiene que disponer de ella a través del mecanismo forzado de pública subasta. Figueroa v. Banco de San Juan, 108

---

[11] En este caso la subasta se celebró bajo las Reglas de Procedimiento Civil de 1979. La regla vigente R. 51.7, 32 L.P.R.A. Ap. V, en lo pertinente, es igual a la derogada.

D.P.R. 680 (1979). Incluso, la Opinión mayoritaria añade que los requisitos procesales de la regla sobre subasta imponen la obligación de entregar, en el acto mismo de la adjudicación, la moneda legal o cheque de gerente por el valor de la propiedad adjudicada. Ello, a su vez, conlleva que un universo reducido de participantes del mercado puedan beneficiarse de participar en la subasta, lo que abona a la disminución del precio.

Más aun, la Opinión mayoritaria sostiene que, en este caso, el mero hecho de que una casa, que años antes tasaba $475,000 se haya adjudicado en subasta por $50,000, no conlleva que esa suma sea "exageradamente inadecuada", pues al adquirirla, los acreedores asumieron dos gravámenes hipotecarios que sumaban $245,000.

A pesar de que toda la normativa discutida hasta este punto de la Opinión del Tribunal da lugar únicamente a concluir que no se puede imponer -por analogía- un tipo mínimo para la venta de bienes en subasta cuando no media una hipoteca, ésta aplica la doctrina de enriquecimiento injusto. Entendemos que la mayoría del Tribunal erra en su proceder.

III.

La doctrina de enriquecimiento injusto recoge una fuente de obligaciones que nacen fuera de una relación

contractual y que hemos desarrollado jurisprudencialmente. Ortiz Andújar v. E.L.A., 122 D.P.R. 817 (1988). Nos dice la profesora Fontánez Torres que "el enriquecimiento injusto es un corolario del concepto de equidad; que está subsumido en el Código Civil en la figura de los cuasicontratos; y que es de carácter subsidiario, en otras palabras, que no puede existir una causa que justifique el enriquecimiento". E. Fontánez Torres, *Obligaciones y Contratos*, 75 Rev. Jur. U.P.R. 245, 258 (2006); véanse Arts. 1787 a 1801, 31 L.P.R.A. secs. 5091-5127. En síntesis, el enriquecimiento injusto ocurre cuando una parte se enriquece a costa de otra sin que exista alguna causa o fuente que justifique un desplazamiento patrimonial. Ortiz Andújar, *supra*.

Los criterios para aplicar la doctrina de enriquecimiento injusto son: (1) existencia de un enriquecimiento; (2) un empobrecimiento correlativo de quien reclama la aplicación de la doctrina; (3) una conexión o relación causal entre el empobrecimiento y el enriquecimiento; (4) falta de una causa o precepto legal que justifique el enriquecimiento; y (5) inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa. Véase, J.R. Vélez Torres, *Derecho de Obligaciones*, 2da. Ed.,

Universidad Interamericana de Puerto Rico, San Juan 1997, pág. 347.

IV.

La Opinión que hoy se emite afecta la seguridad jurídica y el tráfico de bienes. Además, puede dar lugar a consecuencias impredecibles e imprácticas. El derecho aplicable –el mismo que la Opinión del Tribunal analiza– es claro y específico: solo en el ámbito hipotecario existe el requisito de tipo mínimo. Asimismo, las reglas para la ejecución de una sentencia están diseñadas con el propósito de proteger al acreedor. **Si un deudor interesa evitar la ejecución de sus bienes, tiene que entregar lo adeudado y cumplir con la orden judicial dictada en su contra. Para ello, el deudor puede vender sus bienes al precio que estime y, de esa forma, evita el riesgo del precio de remate.** Esto último requiere particular énfasis porque en el caso de autos el deudor se colocó a sí mismo en una posición perjudicial y luego acudió al foro judicial para que se le releve de sus obligaciones.

De otra parte, aplicar la doctrina de enriquecimiento injusto conlleva pasar por alto que aquí existe una causa legal para el enriquecimiento. La razón de ese enriquecimiento es que el deudor por sentencia, teniendo bienes para cumplir con la orden judicial, optó por no cederlos o venderlos e incumplió

con ella. Por ello, se colocó *motu proprio* en la desventajosa situación de que sus bienes se subastaran al precio que resulta -necesariamente- de poner en vigor la Regla de Procedimiento Civil aplicable.

El ordenamiento que compele a la celebración de la subasta, con los parámetros que se han diseñado para ello, y con los riesgos que ello conlleva, **es** la causa de ese beneficio económico correlativo. En particular, el Acta de Subasta recoge para fines contractuales los términos y condiciones de ese desplazamiento patrimonial avalado por la normativa vigente. Dicho de otra forma, en este caso se dictó una sentencia concediendo una cuantía por daños, esa cuantía fue modificada y se convirtió en final y firme. Posteriormente, se embargó un bien del deudor por sentencia y se sometió a subasta. Esa es la **causa** de la transferencia patrimonial entre el deudor por sentencia y el acreedor en este caso. Esa, es además la consecuencia de la puesta en vigor de las reglas y disposiciones que el ordenamiento provee para una subasta.

Además, no podemos perder de vista que la norma que pauta este Tribunal ocurre como resultado directo de que los acreedores lograron revender la propiedad a un precio mayor. Ese no siempre es el caso. Si este Tribunal asumiera que la propiedad se vendió a un

precio que represente una pérdida para el acreedor, no llegaría a este resultado, pues los deudores no habrían acudido a plantear ante el Tribunal de Primera Instancia que la sentencia había sido satisfecha en su totalidad. Desde el punto de vista del deudor, la apreciación futura de un bien subastado es totalmente impertinente.

En este caso, el hecho cierto es que cuando se llamó la subasta, el mercado al cual el ordenamiento había establecido que se iban a ofrecer los bienes objeto de subasta, es decir, quienes estaban ese día presentes en el Tribunal de Primera Instancia, decidió que el valor de ese bien era $50,000, no el valor neto.

Por otro lado, la Asamblea Legislativa conoce, como mínimo desde la aprobación de la Ley Hipotecaria de 1979, sobre la existencia del concepto de tipo mínimo y nunca lo ha aplicado a circunstancias como la de autos. Al hacerlo por fíat judicial, no solo ignoramos la intención legislativa sino que, en la práctica, este Tribunal -en su función adjudicativa- está enmendando las Reglas de Procedimiento Civil sin cumplir con el requisito constitucional de enviarlas a la Asamblea Legislativa conforme a la Sec. 6 del Art. V de la Constitución del E.L.A. L.P.R.A., Tomo 1, pág. 414.

Asimismo, cabe destacar que la doctrina de enriquecimiento injusto existe para proteger a quien sufre un empobrecimiento, pues es esa la única manera de levantar la doctrina ante el foro judicial. Entonces, si lo que se pretende por esta decisión es proteger al deudor que sufre un empobrecimiento mayor a la condonación relativa de su deuda por sentencia, ello no se evita en la mayoría de los casos, pues, cuando la propiedad se adjudica a un tercero que la adquiere en la subasta a un precio menor al valor neto, a ese tercero le resulta impertinente el valor adeudado de la sentencia que dio lugar a la subasta. La decisión del Tribunal indica que es aplicable únicamente cuando es el acreedor por sentencia quien se lleva la subasta que se declara vacante. En otras palabras, en la mayoría de los casos no se lograría evitar lo que busca alcanzar esta decisión. Peor aun, se crea un precepto distinto según el postor a favor de quien se adjudique la subasta, sin establecer una justificación para ese trato desigual.

Resulta preocupante la falta de claridad sobre la aplicación de la nueva norma pautada por este Tribunal. La seguridad jurídica del país y el tráfico comercial dependen necesariamente de un ámbito de certeza legal sobre la forma de ejecutar sentencias y el poder coercitivo del Estado para compeler al pago

de deudas. Nuestro andamiaje depende de una aplicación consistente de las normas que regulan los procesos de subasta. Nos preocupa particularmente la receptividad de esta norma por parte de licitadores de subastas futuras que, ante la aplicación incierta de la doctrina de enriquecimiento injusto, desistan de la oportunidad de participar en ventas judiciales ante el temor de que puedan ser objeto de reclamaciones por enriquecimientos relativos frente a deudores por sentencia. Nuestra labor como intérpretes de la ley debe ser evitar ese tipo de incertidumbre y abonar a la seguridad jurídica.

Por último, cabe destacar que la aplicación futura de este precedente constituirá un reto práctico incalculable para los funcionarios del Tribunal que dirigen el proceso de subasta. Ahora, esos funcionarios tendrán que convertirse en expertos tasadores de todo tipo de bienes en el comercio para establecer el valor neto, como requisito para evitar el enriquecimiento injusto en las subastas. No olvidemos que, salvo contadas excepciones, el foro judicial deja en manos del Alguacil del Tribunal y del acreedor ejecutante, el proceso post sentencia de ejecución, venta y adjudicación de bienes para satisfacer un crédito. Atanasia Corp. v. Saldaña, 133 D.P.R. 284 (1993).

De no poderse acordar un valor neto dentro del proceso de la subasta, las salas de instancia recibirán mociones adicionales y tendrán que convertirse en expertos tasadores para poder resolver las disputas. A fin de cuentas, cada bien a adjudicarse en una subasta podría terminar ante un juez que vendrá obligado a determinar el valor en el mercado antes de que el mismo mercado lo determine en el acto de la subasta. Por consiguiente, se abre la puerta a apelaciones de todo tipo sobre el valor de los bienes y le corresponderá a los foros apelativos convertirse en tasadores de todo tipo de bienes para saber si los foros recurridos llegaron al valor neto correcto. No es esa la función que nos corresponde en situaciones como la de autos.

V.

Somos conscientes de que la Opinión mayoritaria responde a unos hechos muy particulares. En este caso, un profesional perdió su hogar ante una reclamación de impericia que fue traída por quien luego realizó una ganancia sobre la venta de ese hogar. No hay duda de que esos hechos nos consternan a todos. No obstante, no debemos perder de vista que hoy día ese no sería el resultado de una reclamación por daños. Tras la aprobación de la Ley de Protección del Hogar, Ley Núm. 195 de 13 de septiembre de 2011, "todo individuo…

tiene derecho a poseer y disfrutar, en concepto de hogar seguro… una residencia que… estuviere ocupad[a] por este o por su familia exclusivamente como residencia principal". Art. 3, Ley de Protección del Hogar, *supra*. Conforme al referido estatuto, las residencias de quienes cumplan con los requisitos del mismo estarán protegidas contra el riesgo de embargo, sentencia y ejecución. Véase Art. 5, Id.

A pesar de lo anterior, el precedente que hoy se establece afectará la ejecución de sentencias de todo tipo, independientemente del estado de derecho que protege los hogares de los demandados.

Por todo lo anterior, disentimos de la Opinión que hoy se emite y denegaríamos el recurso de *certiorari*.


                                        Federico Hernández Denton
                                            Juez Presidente